343 So.2d 819 (1977)
Monroe W. TREIMAN, As Judge of the County Court of Hernando County, Florida, Appellant,
v.
The STATE of Florida ex rel. Thomas Hamilton MINER, Jr., et al., Appellees.
No. 49061.
Supreme Court of Florida.
February 10, 1977.
Rehearing Denied April 7, 1977.
*820 Robert L. Shevin, Atty. Gen., Charles Corces, Jr. and Donna H. Stinson, Asst. Attys. Gen. and Fletcher N. Baldwin, Jr., Gainesville, for appellant.
Frank McClung of McClung & Underwood, Brooksville, for appellees.
Jerry Oxner of Reynolds & Marchbanks, Boca Raton, for Conference of County Court Judges of Florida, amicus curiae.
SUNDBERG, Justice.
Appellant was at the time these proceedings were commenced a nonlawyer county judge in Hernando County. Appellees, relators below, were arrested on misdemeanor charges which could result in the penalty of imprisonment upon conviction. See Sections 316.028, .029, .061, and 856.011, Florida Statutes. Defendants waived the speedy trial rule. Judge Treiman was the presiding judge in each case, and in each case appellees' attorney moved to recuse or disqualify him. The motions were denied. Thereupon appellees filed a petition for writ of prohibition in the Fifth Judicial *821 Circuit in and for Hernando County. On October 29, 1975, the petition was granted and the writ issued. In its order the circuit court concluded:
"The ruling of the United States Supreme Court in [Gideon v.] Wainwright, [372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963)] and Argersinger [v. Hamlin, 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972)], giving a defendant who is charged with a criminal offense the right to an attorney logically and necessarily includes the right that such defendant's case be presided over by a judge possessing at least the same legal qualifications of the attorney representing the State and defendant."
Judge Treiman appealed from this judgment to the Second District Court of Appeal, which, on appellant's motion, transferred the cause to this Court. We have jurisdiction under Article V, Section 3(b)(1), Florida Constitution.
In Florida there are three types of non-lawyer county judges.[1] First, there are those who were "grandfathered in" when the people of this State adopted a substantial revision to Article V of our Constitution in 1972. Article V, Section 20(d)(7), reads:
"(d) When this article becomes effective:
(7) County judges of existing county judge's courts and justices of the peace and magistrates' court who are not members of bar of Florida shall be eligible to seek election as county court judges of their respective counties."
A second group, covered under Article V, Section 20(c)(11), consists of judges who hold office in counties of fewer than 40,000 people:
"(c) After this article becomes effective, and until changed by general law consistent with sections 1 through 19 of this article:
(11) A county court judge in any county having a population of 40,000 or less according to the last decennial census, shall not be required to be a member of the bar of Florida."
Cf. Section 34.021, Florida Statutes (1975). Finally there are, of course, some nonlawyer county judges who hold their offices by virtue of both constitutional provisions. The appellant in this case was among them.
Appellees argue that the 40,000 population provision denies equal protection of the laws to those who live in smaller counties whose county courts may be presided over by nonlawyer judges. However, our reading of North v. Russell, 427 U.S. 328, 96 S.Ct. 2709, 49 L.Ed.2d 534 (1976), convinces us that such a classification passes constitutional muster. There the defendant was convicted of driving while intoxicated by a nonlawyer judge of the Lynch, Ky., City Police Court. The Supreme Court described the Kentucky statutory scheme as follows:
"Section 156 of the Kentucky Constitution requires cities to be classified according to population size. There are six classes of cities: fifth-class cities have a population of between 1,000 and 3,000; sixth-class cities have a population of less than 1,000. Lynch is a fifth-class city... . A police judge in fifth- and sixth-class cities must by statute be a voter and resident of the city for at least one year and be bonded... . [T]he police judge in such cities need not be a lawyer. Police judges in first-class cities, which have populations over 100,000, must have the same qualifications as circuit judges who must be at least 35 years of age, a citizen of Kentucky, a two-year resident of the district and a practicing attorney for eight years. .. . Police court judges have terms of four years. In fourth-, fifth-, or sixth-class cities police judges may be either appointed or elected.
"Police courts have jurisdiction, concurrent with circuit courts, of penal and misdemeanor cases punishable by a fine of not more than $500 and/or imprisonment of not more than 12 months... *822 Kentucky has a two-tier misdemeanor court system. An appeal of right is provided from the decision of a police judge to the circuit court where all judges are lawyers, and in that court a jury trial de novo may be had... ." (Footnotes omitted) Id. at 2710-11.
The Court later rejected a contention that such a system violates the constitutional guarantee of equal protection, reasoning that "all people within a given city and within cities of the same size are treated equally." Id. at 2714. With the applicable standard having been thus enunciated, we have no difficulty concluding that the division of county courts into two classes effectuated by Section 34.021, Florida Statutes, and Article V, Section 20(c)(11), Florida Constitution, does not violate the equal protection guarantee of the United States Constitution.
The critical question in this case is whether a nonlawyer county judge can afford due process of law to a defendant charged with a crime which leads to possible imprisonment on conviction. North v. Russell, supra, is less than decisive in resolving this issue because there the Court laid great stress on the availability, at the request of the defendant, of a second, de novo trial before a lawyer judge  a feature which our system lacks.
Nor is the experience of other states determinative of the issue before us. While the language of other state appellate court decisions in this area can provide us with some guidance in deciding the merits of the instant cause, the wide variety in state court systems render such determinations mildly persuasive at best. Several state courts have upheld the constitutionality of using nonlawyer judges to try certain classes of cases. E.g., Crouch v. Justice of Peace Court, 7 Ariz. App. 460, 440 P.2d 1000 (1968); City of Decatur v. Kushmer, 43 Ill.2d 334, 253 N.E.2d 425 (1969); North v. Russell, 516 S.W.2d 103 (Ky. 1974); Ditty v. Hampton, 490 S.W.2d 772 (Ky. 1973).
In contrast, the California Supreme Court has held that due process requires that defendants be convicted and sentenced by lawyer judges even in the lowest courts ("justice courts") in counties or districts with 40,000 or fewer residents. That court concluded:
"It has been suggested that our holding could cause serious practical problems in view of the asserted scarcity of attorney judges in certain rural areas throughout this state. We recognize that there will be problems and have sought to minimize them to the extent constitutionally possible. We do not abolish the existing system permitting the use of non-attorney judges in all matters within the justice court jurisdiction. Such judges may continue to function in civil cases, and in criminal cases not involving potential jail sentences. Moreover, even in criminal cases where a jail sentence may be imposed, the non-attorney judge may act so long as defendant or his counsel waives the due process right to have the proceedings presided over by an attorney judge. Such right may be voluntarily relinquished just as the right to counsel may be relinquished. In the event defendant or his counsel fails to so stipulate and no attorney judges are available in the district, then either the cause could be transferred to another judicial district in the same county (see Pen.Code, § 1035), or the Judicial Council could assign an attorney judge from another area to hear the matter."
Gordon v. Justice Court, 12 Cal.3d 323, 115 Cal. Rptr. 632, 639, 525 P.2d 72, 79 (1974), cert. denied, 420 U.S. 938, 95 S.Ct. 1148, 43 L.Ed.2d 415 (1975). Yet this decision is not dispositive of our case because in California justice court judges must either (1) be a member of the bar or (2) have passed a qualifying examination prescribed by the Judicial Council or (3) have been an incumbent in such court or a predecessor court at the time of the 1950 judicial system reorganization and have retained the position continuously. 115 Cal. Rptr. at 634, 525 P.2d at 74. The California court noted that, under the second procedure
"a layman who is not an incumbent justice court judge may qualify as a candidate *823 for election to that court by passing the three-hour examination given by the Judicial Council. We have scrutinized the most recent Judicial Council examination and, although it extends over a wide area of the law, the examination is far less rigorous than the two-and-one-half days State Bar examination required of one seeking to become an attorney. We also note the absence of any requirement of college or law school education in order to qualify as a justice court judge." (Footnote omitted) 115 Cal. Rptr. at 636, 525 P.2d at 76.
As will be seen, such a statement would be inaccurate with respect to the vast majority of our nonattorney county judges.
Appellees read the decisions of the United States Supreme Court in Gideon v. Wainwright, supra, and Argersinger v. Hamlin, supra, as necessarily leading to the conclusion that only a lawyer judge can afford a criminal defendant due process of law when incarceration is a possible result. The expertise of the professional attorney is wasted, they say, if his or her forensic efforts are directed at a judge who has no more educational background to absorb and appreciate such argument than any spectator in the courtroom gallery. As the Court recognized in Argersinger, legal and constitutional questions involved in a case actually leading to imprisonment for only a brief period (i.e., a misdemeanor prosecution) are frequently no less complex than those raised in the trial of a major crime. We agree with appellees, that, after Argersinger, it is clear that a judge who is ignorant of the law cannot afford due process of law to an individual facing imprisonment upon conviction. We do not agree that a judge who makes such a determination must necessarily be a member of The Florida Bar. Cf. Shadwick v. City of Tampa, 407 U.S. 345, 92 S.Ct. 2119, 32 L.Ed.2d 783 (1972). The people of this state through ratification of the revision to Article V of the Constitution in 1972 expressed their consent to a judicial system with limited utilization of nonlawyer county judges as explained above. It is not our function to thwart this decision by the people, provided the constitutional guarantee of due process of law is not abridged.
At the behest of this Court, in August, 1974, a Non-Lawyer County Judge Training Program was begun at the Holland Law Center on the campus of the University of Florida, the sole purpose of which was to provide suitable training to allow nonlawyer county judges to be certified to sit only as county judges in those counties with over 40,000 population. Appellant, who is participating in this program, and amicus curiae provided brief information concerning the scope of this program in appendices to their briefs. They argue that such special training qualifies a nonlawyer judge to hear misdemeanor cases punishable by imprisonment. Pursuant to our October 14, 1976, order to supplement the record in this cause, Professor James R. Pierce, the director of the Non-Lawyer County Judge Training Program, has furnished us with material describing in detail the program's curriculum; hours of study, including duration of the course; and testing methods and grading. Professor Pierce's statement and a summary of the curriculum are reproduced as appendices A and B hereto and we see no point in discussing these materials in detail herein. Based on careful scrutiny of the materials synopsized in the appendices, we conclude that a nonlawyer county judge who completes the Non-Lawyer County Judge Training Program at the University of Florida can constitutionally[2] sentence a defendant to a *824 prison term for commission of a misdemeanor as specified in Section 775.082(4), Florida Statutes.[3]
The program, which began in August 1974, is designed to graduate its class of nonlawyer judges on June 30, 1977. It is possible that the program can be accelerated without sacrificing its scope and content. We hold that those judges who properly complete the educational program, including examinations to test their proficiency, may preside over criminal misdemeanor cases as described above. Our ruling operates prospectively only, following the date this opinion becomes final. The use of recently elected nonlawyer county judges in criminal proceedings depends upon their being properly trained and educated in the law. The completion by the newly elected nonlawyer county judges of a training program similar to the current program is constitutionally necessary for them to be able to discharge their criminal constitutional duties. Anything less fails to meet our construction of relevant due process safeguards.
Of course, our holding here does not preclude a county judge not trained in law from presiding over a criminal misdemeanor trial where the accused makes a knowing and voluntary waiver of his right to a trial presided over by a law trained judge. See Gordon v. Justice Court, supra.
Accordingly, since at the time appellees came before his court, Judge Treiman had not completed the Non-Lawyer County Judges Training Program, the order of the circuit court granting the writ of prohibition is hereby affirmed.
ADKINS, BOYD, ENGLAND and HATCHETT, JJ., concur.
OVERTON, C.J., concurs with an opinion, with which ADKINS, J., concurs.
ROBERTS (Retired), J., dissents with an opinion.
APPENDIX A

I. INTRODUCTION
The Court on October 14, 1976 entered its order requesting, in essence, a complete report on the structure and conduct of the Non-Lawyer County Judge Training Program. To place the data requested in the proper perspective, it is first advisable to provide a brief description of the origins of the program and its overall format.
The program commenced under the auspices of the University of Florida Division of Continuing Education in cooperation with the University of Florida College of Law on August 15, 1974 with 25 participants all of whom were the non-lawyer county judges who intended to continue in office past their then present term. Subsequently, one judge was withdrawn from the program and two recently elected non-lawyer county judges were added. The current number of judges participating is 26. The program originally was structured into two institutes per year. The summer institute involved a resident period of instruction of four weeks including weekends at the University of Florida College of Law. All courses commenced in this summer institute were concluded during the course of the institute. The remainder of the year was *825 organized into an institute requiring resident instruction of four days of each month from October through June. Each institute provided 100 hours of classroom instruction covering three separate courses. The program was organized on this basis for both the 1974-75 and 1975-76 program years. The 1976-77 program year was restructured into a single institute involving a complete week (Monday through Friday) of resident instruction each month for eight months (November, 1976 through June, 1977). The 175 total instruction hours for the fifth institute is divided into five course blocks of 35 hours each. One of the five blocks has been further subdivided into two separate courses.
The underlying philosophy of the program was to provide the participants with a substantial portion of a conventional law school education. Standard law school materials, teaching methodology, examinations and instructors have been used throughout the program in furtherance of this objective. The material covered in the various courses involved material for which approximately 100 quarter hours of credit would be offered in the ordinary curriculum of the University of Florida College of Law. This would calculate to 79% of the 126 hours required for graduation from the College of Law. Because of the rearrangement of the material into slightly different course structures with necessary omissions and instances of abbreviated coverage, 79% probably represents a slight exaggeration of actual coverage. Nonetheless, it should stand as a useful estimate.

II. COMPLIANCE WITH ORDER

1. Curriculum

Attached hereto is a listing of all courses offered during the program indicating the title of the courses, the law professors teaching the courses, and the University of Florida College of Law counterparts to the courses. Attached also is that portion of the College of Law Catalog describing the law school courses. Please be advised that because of a modest restructuring of the law school courses for program purposes, the catalog descriptions will contain slight inaccuracies. For this reason an appendix of exact course descriptions and examinations prepared by the program professors for use during the program has been submitted to the Court and counsel.

2. Hours of Study and Total Duration of Program

During the course of the program approximately 600 hours of resident instruction will have been offered to the participants at the University of Florida College of Law. 575 of these hours have been in the form of regularly scheduled classroom hours. An estimate of approximately 25 hours of instruction has been assigned to the legal writing program to account for the irregularly scheduled lectures and consultations required. The method of instruction used in all courses additionally required literally hundreds of hours in reading, study, composition and preparation outside of the classroom on the part of each participant.
Generally, the total hours of instruction were divided into 32 to 35 hour blocks for each course taught. However, appropriate course coverage on occasion required reallocation of the time available among the courses in somewhat different configurations. The variations would not seem sufficiently significant to detail.
As previously indicated, the program commenced on August 15, 1974 and will be concluded on June 30, 1977.

3. Faculty and Teaching Methods

A complete listing of the program faculty is contained in the curriculum attachment referred to in section one. The program faculty were chosen from the faculty of the College of Law and all are experienced and considered well qualified in the areas to which they were assigned. A listing of the *826 College of Law faculty indicating degrees held and academic rank is attached for reference.
The teaching methodology for the program is identical to the methodology used by the various professors in their regular law courses. The specific methodology varied greatly from course to course, however, a basic familiarity with general law school teaching methods should suffice to provide an adequate insight as to the overall teaching conduct of the program.

4. Testing Methods and Grading

At the outset of the program a basic decision was made against the usual assumption of the absence of testing and grading underlying most other continuing legal education programs. It was thought that to maintain consistency with the philosophy of close replication of a conventional law school experience that some form of testing and academic incentives was necessary.
The basic method of law school examination was retained primarily for its intrinsic value as a substantial learning experience, both in the preparation for exams and in the analysis required in taking them. The examination methods actually used in the program varied widely as can be observed by reference to the complete set of exams given to date contained in the appendix. All exams appear to be appropriate to the course material in each course and in aggregate constitute a fair cross section of conventional law school examination methods.
The grading method used in the program represents an attempt to preserve a system of incentives within a group of students as to which it was thought to be inappropriate to use conventional grading methods. From all observable indications, the system has operated to create the desired level of competition within the group.
The standard grade awarded in each course is simply "complete", which signifies that the student has regularly attended classes and has made a good faith effort in taking the exam. If it is determined that a good faith effort has not been made a grade of "incomplete" is established and an additional examination is scheduled. The system of incentives is predicated upon the ranking of the best ten examinations in each course in the order of accomplishment. The ten best students receive the numerical ranking as a grade in lieu of the standard "complete". Only students who successfully complete the exams on the first taking participate in the ranking.

5. Post Program Requirements

At the present time no further study requirements after graduation have been established.
Appendix B to follow.

*827 APPENDIX B

 CURRICULUM
 NON-LAWYER COUNTY JUDGE TRAINING PROGRAM
----------------------------------------------------------------------------
INSTITUTE COURSES OFFERED PROFESSOR COLLEGE OF LAW MATERIAL COVERED
----------------------------------------------------------------------------
First 1. Florida
 Constitutional J.C. Quarles 1. LW 653 - Florida
 Law Constitutional Law
 2. Civil Procedure H.O. Enwall 2. LW 521 - Civil Procedure
 3. Evidence J.R. Pierce 3. LW 625 - Evidence I
Second 1. Evidence J.E. Lewis 1. LW 626 - Evidence II
 Civil Procedure J.E. Lewis LW 522 - Civil Procedure II
 2. Constitutional
 Law F.N. Baldwin 2. LW 541 - Constitutional
 Law I
 LW 542 - Constitutional
 Law II
 3. Contracts D.B. Deaktor 3. LW 501 - Contracts I
 LW 502 - Contracts II
 4. Legal Writing S. Rubin 4. LW 591 - Legal Writing I
 LW 592 - Legal Writing II
Third 1. Property D.T. Smith 1. LW 531 - Property I
 LW 532 - Property II
 2. Torts W. Probert 2. LW 571 - Torts I
 LW 572 - Torts II
 3. Criminal Law J.C. Quarles 3. LW 581 - Criminal Law
Fourth 1. Commercial
 Transactions D. Delony 1. LW 601 - Commercial Paper
 2. Criminal
 Procedure G.T. Bennett 2. LW 693 - Adversary Process
 J.R. Pierce LW 693 - Police Practices
 3. Business
 Organizations
 Corporations J.J. Freeland 3. LW 602 - Business
 Organizations
 LW 603 - Corporations
Fifth 1. Commercial
 Transactions II W.E. Williams 1. LW 600 - Sales
 LW 606 - Security in Goods
 2. Estates &
 Trusts I D.T. Smith 2. LW 630 - Estates & Trusts I
 3. Remedies F.E. Maloney 3. LW 671 - Remedies
 4. Jurisprudence R.C.L. Moffat 4. LW 610 - Jurisprudence
 5. Domestic
 Relations W.O. Weyrauch 5. LW 690 - Family Law
 6. Professional
 Responsibility D.B. Deaktor 6. LW 619 - Legal Ethics

*828 OVERTON, Chief Justice, concurring.
I fully concur in the opinion by Mr. Justice Sundberg.
It must be recognized that this opinion is based on what is constitutionally required and not what is administratively desirable. Our ruling today is necessary because of the dictates of the United States Supreme Court's decision in North v. Russell, 427 U.S. 328, 96 S.Ct. 2709, 49 L.Ed.2d 534 (1976). It recognizes that a defendant in a criminal trial which may result in imprisonment may be tried by a nonlawyer judge if the defendant has an opportunity for a second trial where evidence will be received before a law trained judge. Although this decision of the United States Supreme Court basically approves the historical use of nonlawyer magistrates, it does so conditionally upon at least one of the historical checks on the judge's authority being available to a defendant.
Under the historic English system magistrates have no authority to try a jury case. Checks on their actions include allowing either an appeal de novo (retrial) before a lawyer judge together with magistrates as fact finders or an opportunity for the defendant to ask for a high court jury trial with a law trained judge. In addition, the English system provides for a clerk who is a lawyer to advise the magistrates on the law. Further, the extent of punishments that can be imposed is more limited than in our present system and, in addition, the sentence is subject to review by a court presided over by a law trained judge. See The Legal Systems of Britain, British Information Services (March 1976), and English and American Criminal Law and Procedure, A Comparative Analysis (M.T. Sennett and B.J. George, Jr., American Bar Association Section of Criminal Justice, 1976).
We provide none of the foregoing checks in the use of nonlawyer judges in our judicial system. Such would require substantial revision in our present system.
ADKINS, J., concurs.
ROBERTS, Justice (Retired), dissenting.
I respectfully dissent and it is my view that a nonlawyer County Judge in a county with a population of less than 40,000 persons has the constitutional power and duty to exercise the full jurisdiction of that office. It is elementary that the sovereign states have the right to prescribe the qualifications for their state and county officials. Section 6, Article V, Constitution of Florida, provides for a County Court with misdemeanor jurisdiction. According to legislative records, the matter of qualifications for County Judges in counties of less than 40,000 was fully debated and the Legislature resolved that a County Judge in such counties would not be required to be a lawyer; see Section 20(c)(11), Article V, Florida Constitution. Upon submission to the people, the electorate of Florida approved the amendment submitted by the legislative resolution; see Section 20(c)(11), Article V, Florida Constitution. To interfere with that orderly process of establishing the qualifications of a county office would be an act of judicial activism with which I cannot agree. Furthermore, the Tenth Amendment to the Constitution of the United States provides:
"The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."
I am unable to find where the State of Florida ever submitted to the Washington government the power to interfere with the prescribing by the people of this state of the qualifications of its county officers, nor can I find any application of the Fourteenth Amendment to the Constitution of the United States in this situation. The answer to the question appears to me to be simple, viz., the Legislature had the right to resolve in a proposed constitutional amendment for a County Court to have jurisdiction over misdemeanors and to be presided over by a nonlawyer County Judge and the people of *829 Florida had the right to adopt that amendment.
I, therefore, respectfully dissent.
NOTES
[1] "Unless otherwise provided by general law, a county court judge must be a member of the bar of Florida." Art. V, § 8, Fla. Const.
[2] As best we can discern, even the dissenting justices in North v. Russell, supra, would find that the Florida program we have described passes constitutional muster. As pointed out in the dissenting opinion of Mr. Justice Stewart:

"The judge at North's state habeas corpus hearing concluded:
"`I think the fact has been established that [Judge Russell is] not a lawyer, he doesn't know any law, he hasn't studied any law.' Judge Russell testified that he had only a high school education. He had never received any training concerning his duties as a lay judge. This is not a case, therefore, involving a lay judge who has received the kind of special training that several States apparently provide. See ante, at 2711-2712 n. 4." [Reference to majority opinion listing Florida, among many other states, as having a "mandatory training program" for nonlawyer judges.]
96 S.Ct. at 2715.
[3] § 775.082(4), Fla. Stat., reads:

"(4) A person who has been convicted of a designated misdemeanor may be sentenced as follows:
(a) For a misdemeanor of the first degree, by a definite term of imprisonment not exceeding 1 year;
(b) For a misdemeanor of the second degree, by a definite term of imprisonment not exceeding 60 days."