[Nos. 44071, 44214.   En Banc.   January 5, 1979.]

GARY ROBERT YOUNG, ET AL, *Respondents,* v. STEPHEN
S. KONZ, *Appellant.*

OSEAS MUNOZ, ET AL, *Petitioners,* v. CECIL
HARPHAM, *Respondent.*

*Slade Gorton, Attorney General,* and *Kevin M. Ryan* and *Garry E. Wegner, Assistants,* for appellant.

*R. Neil Morse, Theodore S. Goodwin,* and *Terry Austin* of *Yakima Valley Legal Services* (*Mark E. Wilson,* of counsel), for petitioners.

*David S. Edwards* of *Colville Tribal Legal Services,* for respondents Young, et al.

*R. P. Reid,* for respondent Harpham.

*George Wynn Colby* on behalf of Yakima Nation Public Defender and *Steven L. Michels,* amici curiae.

HAMILTON, J.—A rehearing was granted in *Young v. Konz,* 88 Wn.2d 276, 558 P.2d 791 (1977) (*Young* I). At issue in the original appeal, as well as the rehearing, is the constitutionality of the state's judicial structure insofar as it permits the utilization of nonlawyer judges in certain courts of limited jurisdiction. These courts exercise jurisdiction over criminal misdemeanor matters which may result in a defendant's loss of liberty.

We held in *Young* I that our statutory scheme permitting such lay judges did not violate constitutional due process and equal protection guaranties. We reaffirm our conclusion.

Briefly, the background giving rise to *Young* I and this rehearing is: Respondents Young, Martin, and Jones were charged in Ferry County District Court with a misdemeanor. The judge of that court is not a lawyer and is not statutorily required to be a lawyer since the district has a population of less than 10,000. RCW 3.34.060. Petitioners Munoz, Castro, and Elizondo, among others, were charged in the municipal court of the town of Granger, Yakima County, with a violation of a municipal ordinance. The municipal court judge of Granger (a municipality with a

population of less than 5,000) is a nonlawyer appointed by the mayor pursuant to RCW 3.50.040.

The Superior Court for Ferry County granted a writ prohibiting the state from proceeding to trial in the district court before the nonlawyer judge. Further action in the Granger Municipal Court was stayed pending consolidation of the two causes and resolution on appeal.

As indicated heretofore, the primary issue decided in *Young* I and to be decided on rehearing is whether the defendants in the respective causes are denied due process of law under Const. art. 1, § 3[1] and U.S. Const. amend. 14, if required to go to trial before a nonlawyer judge of a court of limited jurisdiction for a misdemeanor, from which trial a loss of liberty could result. A secondary issue is whether such proceedings would constitute a denial of equal protection of the laws.

As we noted in *Young* I, the judicial structure, insofar as here pertinent, constitutionally requires judges of the supreme and superior courts to be admitted to the practice of law. Const. art. 4, § 17. Statutorily, the same requirement applies to judges of the intermediate appellate courts. RCW 2.06.050. The constitution does not expressly specify the qualifications for judges of courts of limited jurisdiction, but, rather, as we will hereafter note, implicitly leaves such up to the legislature. Statutory enactments over the years provide that justices of the peace in cities with a population of 5,000 or more must be attorneys. RCW 3.12-.071. Municipal court judges in municipalities of less than a population of 5,000 need not be lawyers. RCW 3.50.040. District court or "justice court" judges and justices of the peace must, if not attorneys, either have served as a justice of the peace or as a municipal or police court judge. In districts with a population of less than 10,000, they are allowed to serve as judges if they pass an examination pro-

---

[1]"No person shall be deprived of life, liberty, or property, without due process of law." Const. art. 1, § 3.

vided by the Supreme Court.[2] RCW 3.34.060. Recently, by Laws of 1973, 1st Ex. Sess., ch. 14, § 3, p. 535, the legislature abolished nonattorney judges in certain counties, *i.e.,* second–class counties with populations of 70,000 or more. This abolition was, however, subsequently repealed by Laws of 1975, 1st Ex. Sess., ch. 197, § 1, p. 654. The effect of the repeal is that any nonattorney who has served as a justice of the peace, municipal court judge, or police court judge prior to 1961 may remain on the bench or refile for the position without taking a qualifying examination.[3]

De novo review is available to misdemeanor defendants, which review is in the superior court before lawyer judges. RCW 3.50.410; RCW 35.22.560; RCW 35.27.540.

In *Young* I, we premised our decision upon the decision of the United States Supreme Court in *North v. Russell,* 427 U.S. 328, 49 L. Ed. 2d 534, 96 S. Ct. 2709 (1976). In that case, the high court considered challenges to Kentucky lay judges virtually identical to those advanced here. To illustrate, we quoted the following from *North* in *Young* I, at pages 282–83:

> Appellant argues that the right to counsel articulated in *Argersinger* v. *Hamlin, supra,* [407 U.S. 25 (1972)] and *Gideon* v. *Wainright,* 372 U. S. 335 (1963), is meaningless without a lawyer–judge to understand the arguments of counsel. Appellant also argues that the increased complexity of substantive and procedural criminal law requires that all judges now be lawyers in order to be able to rule correctly on the intricate issues lurking even in some simple misdemeanor cases. In the context of the Kentucky procedures, however, it is

---

[2]It should be observed that in addition to examinations, extensive seminars for lay judges are conducted under the auspices of the Criminal Justice Training Commission in coordination with the office of the Administrator for the Courts. Furthermore, lay judges are subject to compliance with the Code of Judicial Conduct (CJC Preamble, § 1).

[3]It is worthy of note that at least two lay judges were elected by the citizens of their area after the repeal of the abolition. The electorate thus appears to be satisfied with their competence.

unnecessary to reach the question whether a defendant could be convicted and imprisoned after a proceeding in which the only trial afforded is conducted by a lay judge. In all instances, a defendant in Kentucky facing a criminal sentence is afforded an opportunity to be tried *de novo* in a court presided over by a lawyer–judge since an appeal automatically vacates the conviction in police court. Ky. Rev. Stat. Ann. § 23.032 (1971); Ky. Rule Crim. Proc. 12.06. The trial *de novo* is available after either a trial *or a plea of guilty* in the police court; a defendant is entitled to bail while awaiting the trial *de novo*. 516 S. W. 2d 103 (Ky. 1974).

To avoid the patent impact of *North,* it is first urged that this state, unlike the Kentucky system considered in *North,* makes no provision for de novo appeals from pleas of guilty in courts of limited jurisdiction. We do not, however, conceive that the failure to provide such an appeal in all cases significantly or critically distinguishes this state's system from that reviewed in *North.* Initially, it should be noted that a *voluntary* plea of guilty normally waives the right of appeal whether entered before a lawyer or nonlawyer judge or whether entered in an inferior or superior court. *State v. Eckert,* 123 Wash. 403, 212 P. 551 (1923); *State v. Rose,* 42 Wn.2d 509, 256 P.2d 493 (1953). Next, it should be observed that this court has outlined proper safeguards to insure that courts of limited jurisdiction accept only truly voluntary pleas of guilty. *In re Vensel,* 88 Wn.2d 552, 564 P.2d 326 (1977); JCrR 3.06(1); CrR 4.2(d) and (g). Furthermore, in this respect, it has long been recognized that where collateral questions, such as the validity of the statute or ordinance under which a charge is made, the sufficiency of the complaint, the jurisdiction of the court, or the circumstances under which a guilty plea was made are raised, then appeal and de novo review can follow. *State v. Eckert, supra; State v. Alberg,* 156 Wash. 397, 287 P. 13 (1930); *State v. Haddon,* 179 Wash. 669, 38 P.2d 227 (1934); *State v. Rose, supra.* Finally, it would be a rare instance, indeed, where a defendant would not be afforded release on bail or his own recognizance pending appeal. Given these factors,

we find no substantive merit to the contention that either the judicial system reviewed or the rationale of *North* is distinguishable.

In this same vein, it is asserted that the procedure which must be followed in order for a defendant to obtain a trial before a law–trained judge violates due process. It is claimed that before a defendant is entitled to a trial de novo, he must plead not guilty, endure a full trial before a nonlawyer judge, and be convicted in a court of limited jurisdiction. Aside from the fact that some defendants appearing before a nonlawyer judge are acquitted, and others may not desire to appeal, it is simply not an immutable fact that every defendant must endure a *full* trial to preserve an appeal and secure a second trial. It is not an uncommon practice in courts of limited jurisdiction, be the court manned by a lawyer or nonlawyer judge, for defendants to enter a plea of not guilty and stipulate to the prosecution's case or submit the matter to the court on a mere reading of the arresting officer's written report. These procedures consume a modicum of time, fully preserve appeal rights, and expedite trial de novo. In addition, defendants and their counsel have the benefit of previewing the evidence which will be used against them in superior court should they desire to appeal. Nevertheless, in whatever manner the trial proceeds in the justice or district court, we find no significant due process violation flowing from the double trial theory advocated in support of the proposition that nonlawyer judges in courts of limited jurisdiction should be judicially abolished. As we properly pointed out in *Young* I, at pages 280–81:

> Due process of the law requires a fair trial for each defendant; the fair trial guaranty is protected *through the appeals process*. It is conceded that a fair trial may in certain cases not be afforded by a nonlawyer judge; but we may properly point out that it is also true that a lawyer judge may commit error and thereby deny a fair trial. The due process safeguard in both cases is appeal, the one critical difference being that a defendant in a court

of limited jurisdiction has the *automatic right* to a new trial, irrespective of error in the first trial.

To further elude the import of *North,* it is next contended that we should accord Const. art. 1, § 3 an interpretation giving rise to a higher standard of due process than that accorded the federal due process clause in *North.*

As a first step in this argument, support is sought by undertaking to analogize our approach to an equal protection argument in *Hanson v. Hutt,* 83 Wn.2d 195, 517 P.2d 599 (1973). In *Hanson,* we awarded strict scrutiny on equal protection grounds to a classification based upon sex. This was a higher standard of scrutiny than then accorded to sex classifications by the United States Supreme Court. However, within the framework of the federal equal protection clause of the Fourteenth Amendment, other courts had already begun to give more careful scrutiny to legislative attempts at sexual discrimination. We recognized this in *Hanson v. Hutt, supra* at 199. *See Reed v. Reed,* 404 U.S. 71, 30 L. Ed. 2d 225, 92 S. Ct. 251 (1971).

Further, in *Hanson,* we noted that four United States Supreme Court justices were convinced classifications based upon sex were suspect. The unconvinced justices felt merely that the court should defer categorizing sex classifications until the fate of the Equal Rights Amendment was determined by the people's will. *Hanson v. Hutt, supra* at 200. *Frontiero v. Richardson,* 411 U.S. 677, 36 L. Ed. 2d 583, 93 S. Ct. 1764 (1973). *Importantly,* we observed that the people of Washington State had expressed their will and adopted an equal rights amendment. *Hanson v. Hutt, supra* at 200 n.3. Thus, based upon *all* the foregoing, we defined a standard in excess of the federally required standard. *Hanson v. Hutt, supra.* Quite clearly, the rationale for *Hanson's* higher standard was based entirely on developing constitutional analysis revolving about sex classifications. It did not purport to enlarge due process or equal protection standards in unrelated areas.

▮ As we recognized in *Young* I, the sound approach to this case is to acknowledge and appreciate that Const. art.

1, § 3 is the same as the federal due process clause, and federal cases, while not necessarily controlling, are entitled to be given great weight. *Petstel, Inc. v. County of King,* 77 Wn.2d 144, 459 P.2d 937 (1969); *Herr v. Schwager,* 145 Wash. 101, 258 P. 1039 (1927); *Bowman v. Waldt,* 9 Wn. App. 562, 513 P.2d 559 (1973); *see State v. Moore,* 79 Wn.2d 51, 66, 483 P.2d 630 (1971) (Rosellini, J., dissenting).

Rather than promulgate an expanded due process standard, we should accept *North* and, in light of our long followed practice, give that case the weight to which it is entitled and the weight we accorded it in *Young* I.

Turning to the requisites of fair trial provided under Const. art. 1, § 3, we find no evolution of the concepts basic to fair trial which dictates adoption of a higher standard of due process than that set forth in *North.* In speaking of due process, we have said:

> The essential elements of the constitutional guaranty of due process, in its procedural aspect, are notice and an opportunity to be heard or defend before a competent tribunal in an orderly proceeding adapted to the nature of the case.

*In re Hendrickson,* 12 Wn.2d 600, 606, 123 P.2d 322 (1942).

Our state system, which provides for nonattorney judges in small sparsely populated areas, only in misdemeanor and gross misdemeanor cases, with de novo review from *all* cases, unless review is voluntarily waived, clearly meets this standard.

Other courts have considered the same question and have found nonattorney judges do not violate due process. *See State v. Lynch,* 107 Ariz. 463, 489 P.2d 697 (1971); *Treiman v. State ex rel. Miner,* 343 So. 2d 819 (Fla. 1977); *Decatur v. Kushmer,* 43 Ill. 2d 334, 253 N.E.2d 425 (1969); *Ditty v. Hampton,* 490 S.W.2d 772 (Ky. 1972); *State v. Lindgren,* 235 N.W.2d 379 (Minn. 1975); *In re Hewitt,* 81 Misc. 2d 202, 365 N.Y.S.2d 760 (1975); *State v. Duncan,* 269 S.C. 510, 238 S.E.2d 205 (1977); *Shelmidine v. Jones,* 550 P.2d 207 (Utah 1976); *Thomas v. Justice Court,* 538 P.2d 42 (Wyo. 1975).

*Gordon v. Justice Court,* 12 Cal. 3d 323, 525 P.2d 72, 115 Cal. Rptr. 632 (1974), cited and relied upon by the defendants, is clearly the minority position. Furthermore, *Gordon* was decided before the *North* decision and in a state where population and geographic conditions are considerably different, and where vastly more attorneys are available to act as judges, as well as to provide legal counsel to defendants as required under *Argersinger v. Hamlin,* 407 U.S. 25, 32 L. Ed. 2d 530, 92 S. Ct. 2006 (1975).

In this latter respect, we take note of the observation by the Ferry County Superior Court judge that there were three attorneys at that time practicing in Republic, the county seat of Ferry County. However, reference to the Washington State Bar Association Directory of Attorneys 135 (1977) indicates only two. Be that as it may, given the relative isolation of Republic from other communities in neighboring counties, *i.e.,* Nespelem, Tonasket, and Kettle Falls, the anomaly advocated at once becomes apparent. One of the attorneys no doubt is the prosecuting attorney for Ferry County. If there be two, one, under defendants' theory, would necessarily become the justice court judge, leaving none readily available to act on behalf of a defendant. If there be three, a defendant would have little choice as to who would represent him.

Our attention is further drawn to the increase in membership of the Washington State Bar. Although the number of attorneys presently admitted to practice may appear sufficient to staff the inferior courts, we cannot assume that they will voluntarily locate and commence or continue their practice in sparsely settled urban or rural areas. Attorneys are not pawns to be moved about by judicial fiat. Neither is it a function of this court to "make work" for lawyers. We find no significant merit in this argument.

Under our state constitution, the people have clearly vested the legislature with the sole authority to prescribe the *jurisdiction and powers,* and implicitly the qualifications, of justices of the peace and such other inferior courts

as the legislature may establish. The pertinent constitutional provisions read:

> The judicial power of the state shall be vested in a supreme court, superior courts, justices of the peace, and such inferior courts *as the legislature may provide.*

(Italics ours.) Const. art. 4, § 1.

> [The superior court] . . . shall have such appellate jurisdiction in cases arising in justices' and other inferior courts in their respective counties *as may be prescribed by law.*

(Italics ours.) Const. art. 4, § 6.

> *The legislature* shall determine the number of justices of the peace to be elected and shall prescribe *by law the powers, duties and jurisdiction* of justices of the peace: *Provided,* That such jurisdiction granted by the legislature shall not trench upon the jurisdiction of superior or other courts of record, except that justices of the peace may be made police justices of incorporated cities and towns. Justices of the peace shall have original jurisdiction in cases where the demand or value of the property in controversy is less than three hundred dollars or such greater sum, not to exceed one thousand dollars, *as shall be prescribed by the legislature.* In incorporated cities or towns having more than five thousand inhabitants, the justices of the peace shall receive such salary *as may be provided by law,* and shall receive no fees for their own use.

(Italics ours.) Const. art. 4, § 10 (amendment 28).

> The supreme court and the superior courts shall be courts of record, and *the legislature* shall have power to provide that any of the courts of this state, excepting justices of the peace, shall be courts of record.

(Italics ours.) Const. art. 4, § 11.

> *The legislature* shall prescribe by law the jurisdiction and powers of any of the inferior courts which may be established in pursuance of this Constitution.

(Italics ours.) Const. art. 4, § 12.

> No person shall be eligible to the office of judge of the supreme court, or judge of a superior court, unless he

shall have been admitted to practice in the courts of record of this state, or of the Territory of Washington.

Const. art. 4, § 17.

It seems obvious that within the framework of these provisions, the people, through our constitution, have: (1) explicitly recognized and accepted justices of the peace as well as such inferior courts *as the legislature may create*; (2) vested such courts with the judicial power of the state; (3) authorized only *the legislature* (aside from the constitutional amendment process) to prescribe the powers, duties and jurisdiction of such courts; (4) established appellate jurisdiction over cases arising from such courts in the superior courts; and (5) provided that admission to practice law shall be a qualification only for judges of the superior and supreme courts.

In this vein, *In re Bartz,* 47 Wn.2d 161, 287 P.2d 119 (1955), contains pertinent language to our decision here. The issue in *Bartz* was the power of the legislature to prescribe qualifications for judges of justice courts. In upholding that power, this court, per Rosellini, J., noted:

> The authority of the legislature to determine the powers, duties, and jurisdiction of justices of the peace was expressly granted in Art. IV, § 10. Laws governing the qualifications of these officers had been in effect for many years at the time the constitution was adopted. As early as 1899, the legislature prescribed that, in incorporated cities and towns of the first class, justices of the peace should be attorneys at law. Laws of 1899, chapter 85, § 1, p. 135. When Art. IV, § 10 was amended in 1952 (amendment 28), authority was conferred upon the legislature in the same language as that which appears in the original provision. At that time, the power of the legislature to prescribe qualifications had never been questioned in this court. While that power is not expressly granted in the constitution, it must be remembered that a grant is unnecessary, and the enactment of such laws is not in conflict with any express or implied provision. On the contrary, the establishing and altering of qualifications is a function which should naturally follow the right to prescribe the powers, duties, and jurisdiction of an office. The legislature has consistently acted on the

assumption that it had this power, both before and after the adoption of the constitution.

"Where a particular construction has been generally accepted as correct, and especially when this has occurred contemporaneously with the adoption of the constitution, and by those who had opportunity to understand the intention of the instrument, it is not to be denied that a strong presumption exists that the construction rightly interprets the intention." 1 Cooley's Constitutional Limitations (8th ed.) 144 (1927).

*In re Bartz, supra* at 167–68.

We are satisfied that if the necessity for innovation in this area of the administration of justice is felt by the citizens of this state, the legislature will respond. The concept of all attorney judges on the inferior court level will not thereby be imbedded in constitutional concrete, unreachable by the legislature or the people short of a constitutional amendment.

■ Lastly, we find *North* controlling on the issue of equal protection. The United States Supreme Court in *North* upheld the right of states to classify areas, establishing one system of courts for populated areas and another for rural areas.

We accordingly quash the writ of prohibition and the stay of proceedings issued in these causes and reaffirm *Young v. Konz,* 88 Wn.2d 276, 558 P.2d 791 (1977).

WRIGHT, C.J., and ROSELLINI, STAFFORD, BRACHTENBACH, and HICKS, JJ., concur.

UTTER, J. (dissenting)—The majority approves the exercise of criminal misdemeanor and gross misdemeanor jurisdiction by a nonlawyer district court judge and nonlawyer municipal police court judge, over defendants brought before their courts. It concedes due process of law under both the federal and Washington constitutions requires a fair trial for each defendant and recognizes that a fair trial may not be afforded in some cases before a nonlawyer judge. Having conceded this, however, it concludes the fair

trial guaranty is protected through the appellate process which allows a trial de novo in superior court. This argument is unpersuasive.

The quality of the first trial is as important to the fabric of justice as the quality of the second. It requires no extensive fact–finding hearing to appreciate that many defendants charged with traffic or other offenses heard in the courts here at issue cannot afford either the time or money to avail themselves of a de novo appeal. For them the first trial is their only trial and that proceeding should be conducted with the same skill and dignity as the second one, which they may never be able to afford.

The reasons discussed by the dissent in *North v. Russell,* 427 U.S. 328, 49 L. Ed. 2d 534, 96 S. Ct. 2709 (1976), for invalidating the two–tier justice court system seem persuasive to me, and I conclude that we should hold criminal defendants have a due process right to trial before a lawyer–judge under article 1, section 3 of our constitution.[4] Justice Stewart in that dissent, at page 342, emphasized that the presupposition underlying the acknowledged right to assistance of counsel is "that the judge conducting the trial will be able to understand what the defendant's lawyer is talking about." His dissent was equally disdainful of the attempt by the majority in *North* to limit the application of *Ward v. Village of Monroeville,* 409 U.S. 57, 61–62, 34 L. Ed. 2d 267, 93 S. Ct. 80 (1972), wherein the court held, "the State's trial court procedure [cannot] be deemed constitutionally acceptable simply because the State eventually offers a defendant an impartial adjudication. Petitioner is entitled to a neutral and detached judge in the first instance." In commenting on the *North* majority opinion, Justice Stewart stated, "[t]he Court would distinguish the *Ward* case as 'directed at the need for independent, neutral and detached judgment, not at legal training.' . . . But surely there can be no meaningful constitutional difference

---

[4]"No person shall be deprived of life, liberty, or property, without due process of law." Const. art. 1, § 3.

between a trial that is fundamentally unfair because of the judge's possible bias, and one that is fundamentally unfair because of the judge's ignorance of the law." *North v. Russell, supra* at 345.

By adopting the reasoning and language of Justice Stewart's dissent I do not mean to indicate I believe the majority in *North* is controlling. In *North,* the Supreme Court repeatedly emphasized the availability of a de novo trial even for a defendant pleading guilty in a court of limited jurisdiction. Indeed, the court pointed out in both that case and in *Colten v. Kentucky,* 407 U.S. 104, 32 L. Ed. 2d 584, 92 S. Ct. 1953 (1972), that under the Kentucky system challenged in both cases, there was not any requirement whatever that any defendant endure two trials and the time, expense, and emotional investment inherent therein. Quoting from *Colten,* the *North* majority stressed: "'[the defendant] may also plead guilty without a trial and promptly secure a *de novo* trial in a court of general criminal jurisdiction.'" *North v. Russell, supra* at 336. Here, in contrast, a defendant must necessarily defend on the merits in the district court because a plea of guilty waives the right to a de novo trial. Thus, every defendant must endure a full trial in the district court before becoming entitled to a law–trained judge the second time around. It is precisely this necessity to stand trial twice which violates due process in this case. This feature of the Washington scheme renders it far more objectionable than was the system upheld in *North v. Russell, supra.*

The majority's conclusion that certain short cuts to a verdict may be available in courts of limited jurisdiction is unsatisfactory. Such abbreviated procedures are not always available, nor do they eliminate entirely the unfair burden of duplicative procedures to be borne primarily by defendants of modest means. The system we have in this state is simply not that addressed in *North.*

Yet even were *North* controlling as to the federal constitutional question presented here, I would find a violation of our state's due process provision. The majority accepts the

analysis of the majority in *North,* and adopts that analysis as applicable to our due process clause in the facts of this case. The majority does not foreclose adoption of a different standard under the state due process clause in those cases where the court finds the reasoning of federal courts on pertinent issues unconvincing.

This was our approach in *Hanson v. Hutt,* 83 Wn.2d 195, 517 P.2d 599 (1973), where we found the pertinent provision of our state constitution to provide a greater degree of protection to individuals than does the comparable provision of the federal constitution.

The majority describes *Hanson* as involving a more controversial issue, and thus distinguishes it. I believe *Hanson* rather reflected our willingness to probe more deeply into the meaning of our constitution. Here I believe such a careful investigation necessitates a finding that the system of lay judges breaches the due process requirement.

All judges in Washington are required affirmatively, by our canons of judicial ethics, to "be faithful to the law and maintain professional competence in it." CJC 3(A)(1). Judges under extreme circumstances may have active roles in the conduct of trials.

> The reasons for which a judge may intervene on his own motion include calling and examining witnesses, . . . ordering the severance of defendants, excluding inadmissible evidence, and formulating instructions for the jury. He also has special responsibilities for insuring that confessions and guilty pleas are voluntary. The exercise of these functions is fraught with difficulties. In his quest for a fair trial, the judge must scrupulously avoid identification with the prosecutor or the defense attorney. He is not to assume their roles; nor should he usurp the jury's function.

(Footnotes omitted.) Comment, *The Right to a Legally Trained Judge: Gordon v. Justice Court,* 10 Harvard Civ. Rights–Civ. Lib. L. Rev. 739, 751–53 (1975).

It is not uncommon for judges to have the affirmative burden of formulating instructions for juries, whether requested by the parties or not. Counsel for the prosecution

and defense will frequently request conflicting instructions and the judge must be able to recognize which, if any instructions, most accurately state the law. Beyond this, a judge without a legal education must rely on the advice of others in matters where he should act independently. Some matters such as minimum and maximum sentences and the amount of bail are matters which may be able to be adequately administered with the assistance of special judicial education courses, but it is beyond the scope of education courses to prepare a lay judge properly to rule on the admissibility of evidence, to recognize First Amendment issues, and to deal with the complex Fourth Amendment issues present in motions to suppress evidence. Resolution of these issues involves more than well intentioned common sense and fairness. Sufficient legal knowledge to deal intelligently with complex legal issues is essential and its absence in lay judges makes the possibility of prejudice sufficiently great to deny due process.

Even if we were to require of lay judges the degree of proficiency in evidence, criminal procedure, criminal law, and constitutional law required of those passing the bar examination of this state, defendants would still not receive the standard of judicial training I believe necessary to meet our due process requirements. Training in the broad scope of law and its history and subjection to the mental discipline required by such a course of study provides the foundation for rule of law rather than rule by fiat. Lacking this training the untrained judge by necessity may apply only his own standards. Further, where he errs in his understanding of the law he remains uncorrected, because no record is made of proceedings in district and municipal courts and the lay judge's actions are not reviewed in the de novo trial of a defendant's case. His misunderstanding is perpetuated. I find such a system constitutionally unacceptable.

Because due process is a concept which depends heavily upon "time, place and circumstances", my position in this case would necessarily involve a balancing of the interests

of both the defendant and state. The defendant's interest is that his freedom not be deprived or his property taken without the opportunity for, if he so chooses, a trial appropriate to the nature of the power exercised over him by the court. Conviction of a misdemeanor can have a serious impact on a defendant. The potential for loss of liberty is always present as are the collateral consequences of a con-viction. Increased insurance rates, ineligibility for employment requiring security clearance, increased cost of or impossibility of obtaining bonding, and limitation of professional licensing are but a few of the possible collateral consequences of a conviction. *Special Project—The Collateral Consequences of a Criminal Conviction,* 23 Vand. L. Rev. 929 (1970).

The actual imposition of a jail sentence is not determinative of the complexity of a case because sentences are imposed only after a trial on the issues; cases where a jail sentence may be imposed but a fine is levied instead are indistinguishable in complexity from those resulting in imprisonment.

The State asserts a strong interest in maintaining a lay judicial system. It argues that there are severe problems presented by the lack of availability of attorneys in rural districts. It further urges that the cost of replacing lay justices with law–trained justices is burdensome. These arguments are unpersuasive. The Superior Court stated in its memorandum opinion that there were three lawyers practicing in Republic, the county seat of Ferry County. In addition, the membership of the Washington State Bar Association has increased from 4,902 in 1972 to 7,964 at present. There are 187 lawyers admitted to the bar in Yakima County, the county where Granger is located. Receipts from criminal and traffic cases tried in Republic, the county seat of Ferry County, were $4,259 in 1976 and $13,060 for the municipality of Granger in 1976. It would appear revenues from criminal cases in these jurisdictions are more than adequate to compensate for the expenses of a judiciary admitted to the bar. Further, we have noted

that "ordinary costs in time, effort, and expense incurred by providing a hearing cannot outweigh the constitutional right [to a hearing commensurate with due process]." *Everett v. Slade,* 83 Wn.2d 80, 83, 515 P.2d 1295 (1973). I have considered the opinions of courts in other states which allow the use of lay judges. None of these opinions satisfactorily addresses "the inherent inconsistency in guaranteeing a defendant an attorney to represent him without providing an attorney judge to preside at the proceedings." *Gordon v. Justice Court,* 12 Cal. 3d 323, 333, 525 P.2d 72, 115 Cal. Rptr. 632 (1974).

Adoption of a rule requiring law–trained judges admitted to the bar in all cases where a jail sentence may be imposed would not necessarily require the abolition of the lay judge system in its entirety. They still may function in civil cases, in cases where citizens who have confidence in their fairness and ability are willing to waive their right to an attorney judge, or in cases where no jail sentence may be imposed. The state legislature or a municipality, if concerned about retaining lay judges, may, of course, abrogate the potential of a jail sentence for any of the wide range of traffic offenses and other misdemeanors now heard in district and municipal courts where a jail sentence may be imposed.

The experience in California after the decision in *Gordon v. Justice Court, supra,* abolishing the use of lay judges in criminal cases involving the possibility of incarceration is strong evidence that the determination I would make would cause no upheaval in the criminal justice system. According to the records of the Administrative Office of the Courts of California, no significant problem ever developed as a result of *Gordon.* Many defendants waived their right to a law–trained judge. A slight reorganization resulted in greater efficiency, with law–trained judges able to handle more cases than they previously had been able to manage. New justice court vacancies were statutorily limited to law–trained persons, and for each vacancy, even in remote areas, there were numerous attorney candidates. Our system as

well would adapt in order to comply with the constitutional standard.

HOROWITZ and DOLLIVER, JJ., concur with UTTER, J.

