[No. 47247–5.   En Banc.   October 15, 1981.]

ALDERWOOD ASSOCIATES, ET AL, *Respondents,* v.
WASHINGTON ENVIRONMENTAL COUNCIL,
ET AL, *Petitioners.*

*Michael W. Gendler,* for petitioners.

*Craig V. Wentz,* for respondents.

*Rita L. Bender* on behalf of American Civil Liberties Union, amicus curiae for petitioners.

UTTER, J.—Alderwood Associates obtained a temporary restraining order from the Superior Court for Snohomish County, enjoining the Washington Environmental Council and others (defendants) from soliciting signatures or demonstrating in the Alderwood Mall Shopping Center. The Court of Appeals, upon defendants' request, granted a stay of the order and certified the issue to us. We reverse and hold that defendants' activities were protected by the Washington Constitution.

Petitioners (defendants) are the "Don't Waste Washington Committee" which sponsored Initiative 383, entitled "The Radioactive Waste Storage and Transportation Act of 1980." To qualify the initiative for the November ballot, petitioners were required to obtain 123,700 signatures of registered voters no later than July 4, 1980. When this action was filed on July 1, 1980, the committee had obtained approximately 120,000.

Respondent, Alderwood Associates, owns and operates Alderwood Mall in Lynnwood, Washington. That mall is a regional shopping center with more than 1,000,000 square feet of store area on 110 acres of land. It contains parking for more than 6,000 automobiles and impact statements on file project 22,000 automobiles entering the mall on an average day in 1978, increasing to 39,600 by 1985.

Permission was sought on June 27, 1980, for petitioners to solicit signatures in the mall. Permission had already been granted by other mall proprietors in the Puget Sound area. But, unlike those proprietors, respondents denied the request.

Believing the denial to be unconstitutional, petitioners proceeded to solicit signatures in the Alderwood Mall in the same manner as permitted by other mall owners. A card table was set up, until respondents requested its removal.

They then asked passersby, in a nonobstructive manner, if they wished to sign the initiative petition. More than 100 signatures were obtained each hour and no one alleges that petitioners annoyed or harassed the patrons of the mall or in any way interfered with business activities.

## MOOTNESS

Although the controversy between the parties is no longer extant and the case is moot, this court will review an otherwise moot case if certain factors are present. *In re Patterson,* 90 Wn.2d 144, 579 P.2d 1335 (1978); *Sorenson v. Bellingham,* 80 Wn.2d 547, 496 P.2d 512 (1972). A moot case will be reviewed if its issue is a matter of continuing and substantial interest, it presents a question of a public nature which is likely to recur, and it is desirable to provide an authoritative determination for the future guidance of public officers. *Patterson, supra; Sorenson, supra.*

In *Pruneyard Shopping Center v. Robins,* 447 U.S. 74, 64 L. Ed. 2d 741, 100 S. Ct. 2035 (1980),[1] the United States Supreme Court held that state courts may construe *state law* to authorize individuals to speak and petition in shopping malls. Since we have not yet expressly determined the contours of any relevant state law, the question presented by this case is one which is likely to recur and, given its importance, an authoritative determination is needed. The controversy thus fits within our previous guidelines and should be decided, even though moot.

## SCOPE OF REVIEW

Whether to grant a temporary injunction lies within the sound discretion of the court, to be exercised according to the circumstances of each case. *Isthmian S.S. Co. v. National Marine Engineers' Beneficial Ass'n,* 41 Wn.2d 106, 247 P.2d 549 (1952); *Blanchard v. Golden Age Brewing Co.,* 188 Wash. 396, 63 P.2d 397 (1936). In exercising that discretion and in granting a temporary injunction, the court

---

[1] For the purposes of this opinion, the California Supreme Court's decision in *Pruneyard* will be referred to as "*Robins.*"

must issue findings of fact and conclusions of law and set forth in the order the reasons for its issuance. CR 52(a)(2)(A) and CR 65(d). In this case, the temporary restraining order and order to show cause contain neither. This indicates the trial court was issuing the temporary restraining order as a matter of law.

The primary issue is thus one of law as to whether petitioners' actions were constitutionally protected. As such, we will review the temporary restraining order to determine if there was "a clear legal right to it." *Isthmian,* at 117; *Port of Seattle v. International Longshoremen's Union,* 52 Wn.2d 317, 324 P.2d 1099 (1958); *State ex rel. Hays v. Wilson,* 17 Wn.2d 670, 137 P.2d 105 (1943). If there is any set of facts which would legally justify petitioners' activities, the trial court must be reversed.

## SPEECH AND INITIATIVE RIGHTS

*Hudgens v. NLRB,* 424 U.S. 507, 47 L. Ed. 2d 196, 96 S. Ct. 1029 (1976), held that the first amendment to the United States Constitution does not confer the untrammeled right to speak, picket, or petition in a privately owned shopping center.[2] *Accord, Lloyd Corp. v. Tanner,*

---

[2]*Hudgens v. NLRB,* 424 U.S. 507, 47 L. Ed. 2d 196, 96 S. Ct. 1029 (1976), represents a retreat from earlier federal law. To understand the significance of our resolution of this case, and since we employ many of the pre–*Hudgens* principles, a brief historical survey is necessary.

In *Marsh v. Alabama,* 326 U.S. 501, 90 L. Ed. 265, 66 S. Ct. 276 (1946), the United States Supreme Court ruled that a privately owned company town could not convict an individual for distributing religious literature. After balancing the need to receive information against private property rights, and concluding that the company town was the "functional equivalent" of any municipality, the court held that the activity was protected by the First Amendment.

Years later, the court applied the *Marsh* rationale to privately owned shopping centers. In *Food Employees Local 590 v. Logan Valley Plaza, Inc.,* 391 U.S. 308, 20 L. Ed. 2d 603, 88 S. Ct. 1601 (1968), the court ruled that the First Amendment entitled individuals to picket one of many stores in a shopping mall. It concluded that the "Logan Valley Mall is the functional equivalent of a 'business block' and for First Amendment purposes must be treated in substantially the same manner." *Logan Valley,* at 325.

The *Logan Valley* reasoning, however, was substantially rejected in *Lloyd Corp. v. Tanner,* 407 U.S. 551, 33 L. Ed. 2d 131, 92 S. Ct. 2219 (1972). There, the court held that a shopping center was not required to permit the distribution of

407 U.S. 551, 33 L. Ed. 2d 131, 92 S. Ct. 2219 (1972). As consistently recognized, the First Amendment only protects speech from state imposed restraints. *Hudgens, supra; Lloyd, supra.*[3] In *Hudgens,* the United States Supreme Court concluded that restraints imposed by privately operated shopping malls are not actions by the government, and consequently the shopping center in that case was not required to permit labor picketing.

Individuals, however, are entitled to speak or petition in privately owned centers if state law confers such a right and if its exercise does not unreasonably interfere with the constitutional rights of the owner. *Pruneyard, supra.* In *Pruneyard,* the United States Supreme Court held that state courts may construe state law to authorize individuals to speak and petition in shopping malls, regardless of the mall owner's wishes. The Pruneyard Shopping Center, because of the California Constitution, was thus required to permit the circulation of a petition addressed to the federal government.

In *Pruneyard,* the court held that the California law, as applied in that case, did not violate due process or constitute a taking of private property without just compensa-

---

antiwar leaflets. The "functional equivalent" doctrine, as applied by *Logan Valley* and *Marsh,* was rejected because the mall owners did not have complete control over the channels of communication. The court noted that the leaflets could have been distributed on the public streets and sidewalks surrounding the center. It also stressed that, unlike in *Logan Valley,* the leaflets had no relation to the businesses and purposes of the mall.

That *Lloyd* had in effect overruled *Logan Valley* was made clear in *Hudgens v. NLRB, supra.* In *Hudgens,* it was held that a shopping center could ban the picketing of one of its stores. The court rejected the "related to use" rationale of *Lloyd* and unambiguously ruled that the actions of the shopping mall were not those of the State and hence were beyond the reach of the First Amendment.

[3]State imposed restraints can take various forms. The State may outlaw activities involving the exercise of a right. Glennon & Nowak, *A Functional Analysis of the Fourteenth Amendment "State Action" Requirement,* 1976 Sup. Ct. Rev. 221, 229. Alternatively, it could curtail or eliminate the right by creating or explicitly approving of some nongovernmental activity. Glennon & Nowak, *supra* at 229. Or, it might simply refrain from passing laws which bar nongovernmental restraints. Glennon & Nowak, *supra* at 229.

tion. If either of those rights had been violated, the speech activity would not have been protected. While acknowledging that the right to exclude others is an essential property right, the court noted that not every injury to property is unconstitutional and pursuant to the police power, states may impose reasonable restrictions on any property's use. *Pruneyard,* 447 U.S. at 81–82. In determining that Pruneyard had suffered no constitutional injury, the court considered such factors as the character of the speech activity and its economic impact on the mall owner's "reasonable investment–backed expectations." *Pruneyard,* at 83. It reasoned that Pruneyard's right to exclude was not "so essential to the use or economic value of [the] property" as to transform the speech activity into a "taking" of property. *Pruneyard,* at 84. The large size and public character of Pruneyard Shopping Center,[4] together with the power granted it by the State to impose reasonable restrictions on the time, place, and manner of expression, indicated that the speech activity of that case did not substantially diminish the value of the property or significantly interfere with "reasonable investment backed expectations." *Pruneyard,* at 84. Similarly, permitting the speech activity in *Pruneyard* did not violate due process because the California speech provision was rationally related to the goal of enhancing speech and thus was neither arbitrary nor capricious. The court stressed, however, that had the case involved the proprietor of a modest retail establishment or an individual homeowner, a different result might have been reached.

We must therefore determine whether our state law, which is similar to that of California, confers a speech right greater than that of the first amendment to the United States Constitution and, if so, did it protect petitioners' actions.

---

[4]By comparison, Alderwood Mall is approximately five times larger than the Pruneyard center which spans about 21 acres, 5 of which are devoted to parking.

I

■ The United States Supreme Court has consistently held that state courts may interpret state law to be more protective of individual rights than the federal constitution. *See, e.g., Pruneyard,* 447 U.S. at 81; *Oregon v. Hass,* 420 U.S. 714, 43 L. Ed. 2d 570, 95 S. Ct. 1215 (1975); *Cooper v. California,* 386 U.S. 58, 17 L. Ed. 2d 730, 87 S. Ct. 788 (1967); *Johnson v. New Jersey,* 384 U.S. 719, 16 L. Ed. 2d 882, 86 S. Ct. 1772 (1966). The fourteenth amendment to the United States Constitution, which applies the federal constitution to the states, only establishes the minimum degree of protection that a state may not abridge. *Pruneyard, supra; Oregon v. Hass, supra;* Project, *Toward an Activist Role for State Bills of Rights,* 8 Harv. C.R.–C.L.L. Rev. 271, 284 (1973); Note, *Robins v. Pruneyard Shopping Center: Federalism and State Protection of Free Speech,* 10 Golden Gate U. L. Rev. 805, 817 (1980). As acknowledged by the Alaska Supreme Court:

> While we must enforce the minimum constitutional standards imposed upon us by the United States Supreme Court's interpretation of the Fourteenth Amendment, we are free, and we are under a duty, to develop additional constitutional rights and privileges under our Alaska Constitution if we find such fundamental rights and privileges to be within the intention and spirit of our local constitutional language . . .

*Baker v. Fairbanks,* 471 P.2d 386, 401–02 (Alaska 1970). *Accord, People v. Longwill,* 14 Cal. 3d 943, 951, 538 P.2d 753, 123 Cal. Rptr. 297 (1975).

State courts are obliged to determine the scope of their state constitutions due to the structure of our government.

> In the compound republic of America, the power surrendered by the people is first divided between two distinct governments; and then the portion allocated to each subdivided among distinct and separate departments. Hence a double security arises to the rights of the people. The different governments will control each other, at the same time each will be controlled by itself.

*The Federalist* No. 51 (Modern Library ed. 1937, at 339)

(A. Hamilton or J. Madison). When a state court neglects its duty to evaluate and apply its state constitution, it deprives the people of their "double security." It also removes from the people the ability to try "novel social and economic experiments"—which is another important justification for the federal system. *Williams v. Florida,* 399 U.S. 78, 133, 26 L. Ed. 2d 446, 90 S. Ct. 1893 (1970) (Harlan, J., concurring); *New State Ice Co. v. Liebmann,* 285 U.S. 262, 311, 76 L. Ed. 747, 52 S. Ct. 371 (1932).

There has been a reluctance by state courts to interpret and to apply their state constitutions. This can be attributed to the failure of litigators to claim state constitutional errors. *State v. Schmid,* 84 N.J. 535, 423 A.2d 615, 627 (1980). It also reflects the fact that often state and federal constitutions have conferred the same protections. *See, e.g., Hillside Community Church, Inc. v. Tacoma,* 76 Wn.2d 63, 455 P.2d 350 (1969); *Young v. Konz,* 91 Wn.2d 532, 588 P.2d 1360 (1979).

We have often independently evaluated our state constitution and have concluded that it should be applied to confer greater civil liberties than its federal counterpart when the reasoning and evidence indicate such was intended and is necessary. *State v. Simpson,* 95 Wn.2d 170, 622 P.2d 1199 (1980); *State v. Fain,* 94 Wn.2d 387, 617 P.2d 720 (1980); *State v. Hehman,* 90 Wn.2d 45, 578 P.2d 527 (1978); *Darrin v. Gould,* 85 Wn.2d 859, 540 P.2d 882 (1975); *Olympic Forest Prods., Inc. v. Chaussee Corp.,* 82 Wn.2d 418, 511 P.2d 1002 (1973). Where controlling federal principles have not changed with the evolution of our society or where they have been recently overruled by the United States Supreme Court, our constitution has been applied. *See, e.g., Simpson, supra; Fain, supra.* The law is not a static concept and it expands to meet the changing conditions of modern life. *See McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 4 L. Ed. 579 (1819); *Robins v. Pruneyard Shopping Center,* 23 Cal. 3d 899, 592 P.2d 341, 345, 153 Cal. Rptr. 854 (1979). Old principles are continually reexamined and where our earlier cases have relied in part

on overturned federal precedent, we will determine whether the considerations underlying that precedent continue to have vitality and hence require its perpetuation as a matter of state law. *Simpson, supra.*

This case has both of the above characteristics. Although not decided by us, *Sutherland v. Southcenter Shopping Center, Inc.,* 3 Wn. App. 833, 478 P.2d 792 (1970), *review denied,* 79 Wn.2d 1005 (1971), was decided in part on the basis of *Food Employees Local 590 v. Logan Valley Plaza, Inc.,* 391 U.S. 308, 20 L. Ed. 2d 603, 88 S. Ct. 1601 (1968), now overruled by *Lloyd* and *Hudgens.* Citizens of this state have patterned their conduct on *Sutherland,* which held, on both federal and state constitutional grounds, that shopping centers may not deny signature gathering. Also, this case is representative of an area where the law has remained constant while society, in both its expectations and behavior, has changed. At the time of *Marsh v. Alabama,* 326 U.S. 501, 90 L. Ed. 265, 66 S. Ct. 276 (1946), the seminal case in this area, the concept of shopping malls had yet to be developed. Then, most public forums were located in downtown business districts, whereas now people spend more time in shopping centers than anywhere else, excepting their home and job. *See Sutherland, supra; Robins,* 23 Cal. 3d at 907; *Important Facts About Shopping Centers— Main Street U.S.A.,* Int'l Council of Shopping Centers Newsletter, No. 3 (Jan. 1975). The law concerning free speech has to a large degree evolved from a period when town centers were the only public forums. *See* 10 Golden Gate U. L. Rev., at 836. Because the nature of the public forum has changed, it is necessary to reassess the underpinnings for the existing free speech principles.

## II

It is undisputed that gathering initiative signatures in some manner, at some place, is a constitutionally guaranteed practice. It is at the core of both the First Amendment and Const. art. 1, § 5. *United States v. Cruikshank,* 92 U.S. 542, 552, 23 L. Ed. 588 (1875); *Sutherland, supra.* As stated

by the United States Supreme Court:

> The very idea of a government, republican in form, implies a right on the part of its citizens to meet peaceably for consultation in respect to public affairs and to petition for a redress of grievances.

*Cruikshank,* at 552. The right is also specifically guaranteed by the Constitution of the State of Washington, amendment 7, which states that "[t]he first power reserved by the people is the initiative."

The only dispute is whether Washington law permits signature solicitation at privately owned shopping centers. As already noted, the first amendment to the United States Constitution does not require shopping malls to tolerate the signature practice. *See Hudgens v. NLRB,* 424 U.S. 507, 47 L. Ed. 2d 196, 96 S. Ct. 1029 (1976); *Lloyd Corp. v. Tanner,* 407 U.S. 551, 33 L. Ed. 2d 131, 92 S. Ct. 2219 (1972). It provides:

> Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people . . . to petition the government for a redress of grievances.

It specifically limits only governmental interference. *Hudgens, supra; Lloyd, supra.*

In contrast, Const. art. 1, § 5 is not by its express terms limited to governmental actions. In this regard, it is like amendment 7 of the Washington Constitution. Section 5 provides:

> Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that right.

We have never had to determine whether section 5 and amendment 7 require the same "state action" as the Fourteenth Amendment. In *Sutherland,* a case substantially similar to this one, the Court of Appeals did perform a "state action" analysis, but without determining whether the state constitution required it. Such a determination was then unnecessary in light of those facts and existing federal law.

The California constitutional speech guaranty, article 1, section 2, is substantially similar to section 5. In fact, sec-

tion 5 was modeled after it. Beardsley, *Notes on the Sources of the Washington Constitution, 1889–1939*, reprinted in *Constitution of the State of Washington*, app. at 4, 6 (1939). The California Supreme Court has determined that the California provision does not require "state action," as defined by the United States Supreme Court. *Robins v. Pruneyard, supra. Laguna Publishing Co. v. Golden West Publishing Corp.*, 110 Cal. App. 3d 43, 167 Cal. Rptr. 687 (1980).

New Jersey also has a constitutional provision like ours. *See* N.J. Const. art. 1, ¶ 6.[5] The New Jersey Supreme Court has held, like the court in California, that its provision does not require "state action." *Schmid*, 423 A.2d at 628, 639.[6] It applies to all private entities which have put their property to a public use. *Schmid*, 423 A.2d at 628. In *Schmid*, the court held that a private university could not evict a person for distributing political literature upon its campus.

█ Both *Schmid* and *Robins*, in applying their state constitutions, rejected the "state action" requirement of the Fourteenth Amendment. They could do that because of the linguistic differences between the state and federal provisions and because the "state action" requirement of the Fourteenth Amendment is the product of several factors not relevant to the state provisions. *See* Project, *supra* at

---

[5]"Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press." N.J. Const. art. 1, ¶ 6.

[6]In reaching that result, the New Jersey Supreme Court also considered N.J. Const. art. 1, ¶ 2. That provision is substantially similar to our Const. art. 1, § 1. Section 1 provides:

> All political power is inherent in the people, and governments derive their just powers from the consent of the governed, and are established to protect and maintain individual rights.

The New Jersey Supreme Court stated that such a provision "imposes upon the State government an affirmative obligation to protect fundamental individual rights" and, consequently, it was a partial justification for not burdening New Jersey's free speech guaranty with a "state action" requirement. *State v. Schmid*, 423 A.2d at 627, citing *In re Quinlan*, 70 N.J. 10, 19 n.1, 355 A.2d 647 (1976).

290. The "state action" analysis under the Fourteenth Amendment is essentially a judicial balancing of competing interests. Glennon & Nowak, *A Functional Analysis of the Fourteenth Amendment "State Action" Requirement,* 1976 Sup. Ct. Rev. 221, 222, 232–36; *Schmid,* 423 A.2d at 634 (Parshman, J., concurring and dissenting in part). *Compare Logan Valley, supra, with Lloyd, supra.* As acknowledged by Justice Marshall's dissent in *Lloyd,* at 580:

> We must remember that it is a balance that we are striking—a balance between the freedom to speak, a freedom that is given a preferred place in our hierarchy of values, and the freedom of a private property owner to control his property. When the competing interests are fairly weighed, the balance can only be struck in favor of speech.

But not noted by Justice Marshall, and hidden within the balancing, are two factors not restraining state courts when applying state law. Project, *supra* at 290.

The first is that when the United States Supreme Court interprets the Fourteenth Amendment, it establishes a rule for the entire country. Project, *supra* at 290. The court must thus establish a rule which accounts for all the variations from state to state and region to region. The rule must operate acceptably in all areas of the nation and hence it invariably represents the lowest common denominator. Project, *supra* at 290.

The second factor, which is related to the first and actually results from it, is that the Supreme Court must take a conservative theoretical approach to applying the Fourteenth Amendment.[7] Project, *supra* at 290. Federalism prevents the court from adopting a rule which prevents states from experimenting.

---

[7]The history of the Fourteenth Amendment exclusionary rule illustrates the influence of both of these factors. It was because state courts were not limited by these factors that they were the first to adopt the exclusionary rule and, as a result of the statewide acceptance, that the rule was ultimately incorporated into the federal law. *See Wolf v. Colorado,* 338 U.S. 25, 93 L. Ed. 1782, 69 S. Ct. 1359 (1949); *Mapp v. Ohio,* 367 U.S. 643, 6 L. Ed. 2d 1081, 81 S. Ct. 1684, 84 A.L.R.2d 933 (1961).

Like those in New Jersey and California, our speech and initiative provisions do not expressly mention "state action." And we too are not limited by the factors confronting the United States Supreme Court when it applies the Fourteenth Amendment. This permits us to evaluate in each case the actual harm to the speech and property interests. Therefore, given these differences, we choose to follow the approach of *Schmid* and *Robins* which recognizes that the "state action" analysis of the Fourteenth Amendment is required by the language of the federal, but not the state, constitution. We have held in other contexts that where our constitutional provision is linguistically different from its parallel in the federal constitution, we are not bound to treat the state and federal constitutions as coextensive. *See, e.g., State v. Simpson,* 95 Wn.2d 170, 622 P.2d 1199 (1980); *State v. Fain,* 94 Wn.2d 387, 617 P.2d 720 (1980).

### III

■■ Although we read section 5 and amendment 7 as not requiring the same "state action" as the Fourteenth Amendment, that does not mean those provisions are applicable to all speech and initiative activities. If there were no limitations to their application, every private conflict involving speech and property rights would become a constitutional dispute.[8] Note, *Robins v. Pruneyard Shopping Center: Free Speech Access to Shopping Centers Under the California Constitution,* 68 Cal. L. Rev. 641, 659 (1980). Such an approach would deny private autonomy and property rights in the same way as the "state action" requirement of the Fourteenth Amendment denies free speech. To endorse either approach would ignore the validity of certain constitutional rights and would be inconsistent with the balancing approach generally employed in

---

[8]Section 5 and amendment 7 could be interpreted as not requiring any "state action." The thirteenth amendment to the United States Constitution has been so interpreted because, like our provision, it does not expressly mention "state action." *Runyon v. McCrary,* 427 U.S. 160, 49 L. Ed. 2d 415, 96 S. Ct. 2586 (1976).

resolving First Amendment and property rights conflicts. *See generally Sutherland v. Southcenter Shopping Center, Inc.*, 3 Wn. App. 833, 478 P.2d 792 (1970); *Pruneyard Shopping Center v. Robins*, 447 U.S. 74, 64 L. Ed. 2d 741, 100 S. Ct. 2035 (1980); *State v. Schmid*, 84 N.J. 535, 423 A.2d 615 (1980). Instead, being sensitive to the competing speech and property rights, we conclude that section 5 and amendment 7 are applicable when, after balancing all the interests, the balance favors the speech and initiative activity.

This balancing we endorse is quite different from that used in Fourteenth Amendment analysis. For as noted above, the balancing under the Fourteenth Amendment involves two factors not applicable to the application of our state constitution. Freed from those restraints, we are able to be more sensitive to the speech and property interests in each case and, consequently, can strike a more just balance than that dictated by the Fourteenth Amendment.

Determining when the Washington speech and initiative guaranties will apply to private conduct must evolve with each decision, for an all inclusive definition is not practicable. The approach, however, involves balancing several factors. The first is the use and nature of the private property. *Sutherland, supra; Pruneyard, supra; Schmid*, 423 A.2d at 630; 68 Cal. L. Rev. at 661. As property becomes the functional equivalent of a downtown area or other public forum, reasonable speech activities become less of an intrusion on the owner's autonomy interests. *Marsh, supra; Lloyd, supra; Pruneyard, supra; Schmid*, 423 A.2d at 630. When property is open to the public, the owner has a reduced expectation of privacy and, as a corollary, any speech activity is less threatening to the property's value. *See Sutherland, supra; Pruneyard, supra.*

A second factor is the nature of the speech activity. *Sutherland, supra; Pruneyard, supra; Schmid*, 423 A.2d at 630. The exercise of free speech is given great weight in the balance, because it is a preferred right. *Marsh, supra; Sutherland, supra.* And where the exercise of the speech

also involves the initiative process, the activity takes on added constitutional significance. *Sutherland, supra; Robins, supra.*

The potential for reasonable regulation of the speech must also be considered. No one has an absolute right to free speech. The time, manner, and place of the exercise of that right may be regulated. *Cox v. Louisiana,* 379 U.S. 536, 554–55, 13 L. Ed. 2d 471, 85 S. Ct. 453 (1965); *Sutherland, supra; Pruneyard, supra; Schmid, supra.*

Some speech activity may be so unreasonable as to violate the property owner's First Amendment[9] and property rights. As noted by the United States Supreme Court, there may be some speech activity that so impairs the value or use of property that it constitutes an uncompensated "taking" of private property and a violation of due process. *Pruneyard, supra.* In such a situation, the speech will not be protected.

This case is not one where the speech activity so affects the value or use of the shopping center as to constitute a "taking" of the mall owners' property. The activity is substantially similar to that in *Pruneyard,* where the United States Supreme Court held that the mall owners' rights had not been violated. In *Pruneyard,* high school students were permitted to circulate a petition within the mall. As in *Pruneyard,* petitioners' activities were neither disruptive nor offensive. In fact, they had been allowed in other shopping centers of similar size within our state. Those other mall proprietors had granted permission on the condition that the activity be orderly and not interfere with business activities. Petitioners agreed to those conditions, indicating that the activity was one susceptible to reasonable regulation and could be performed in a manner that accommodated both parties' needs.

---

[9]Undisputedly, property owners have a First Amendment right not to participate in the dissemination of any ideological message. *Pruneyard,* at 86. But in *Pruneyard* on facts similar to these, the United States Supreme Court found that right not violated.

Also, reading our state constitution to allow this type of activity does not violate due process. *See Pruneyard, supra.* Signature gathering in a shopping mall furthers the exchange of ideas and the initiative process. It thus is a reasonable means of serving two important state interests. *See Nebbia v. New York,* 291 U.S. 502, 78 L. Ed. 940, 54 S. Ct. 505, 89 A.L.R. 1469 (1934); *Pruneyard,* 447 U.S. at 84.

On the other hand, to bar this activity would significantly undermine free speech and particularly the effectiveness of the initiative process. The shopping center now performs a traditional public function by providing the functional equivalent of a town center or community business block. There are, as of 1980, 139 shopping centers in the Seattle metropolitan area. Seattle Post–Intelligencer, Shopping Center Directory (1980). (Area includes the 60–mile corridor between Everett and Tacoma.) The ability to gather *the requisite number of initiative signatures, and to com*-municate ideas, would be greatly reduced if access to those centers were denied. *Sutherland, supra; Robins, supra.*

After balancing all these factors and having found that the owners' constitutional rights were not violated, we believe that petitioners' activities were protected. As already noted, free speech is accorded considerable weight in the balance. Added to that is this State's vital interest in the initiative process. The only offsetting consideration is the mall owners' private autonomy interests, which are quite minimal in the context of shopping centers. That interest, in this case, is not sufficient to overcome petitioners' rights.

Since the balance favors the speech and initiative activity, section 5 and amendment 7 are applicable. Given that a municipality could not have barred petitioners' actions, we conclude that they were permissible and thus that the temporary restraining order was improperly granted.

ATTORNEYS' FEES

Petitioners argue that pursuant to *Cecil v. Dominy,* 69 Wn.2d 289, 418 P.2d 233 (1966), attorneys' fees are recoverable for the wrongfully issued temporary restraining order. Respondents argue that the restraining order was dissolved on the date specified by the trial court, that any efforts on appeal could not have been related to dissolution of the order, and that the case of *Ritchie v. Markley,* 23 Wn. App. 569, 597 P.2d 449 (1979), is applicable.

In *Ritchie,* a restraining order was dissolved by stipulation of the parties and the Court of Appeals ruled that attorneys' fees could be awarded only for the fees incurred for and prior to the dissolution of the order. There has been no similar stipulation in this case nor has the order been dissolved by trial, motion, or hearing. We therefore remand this case to the trial court to determine what fees should be imposed.

The trial court is reversed.

ROSELLINI, WILLIAMS, and DORE, JJ., concur.

DOLLIVER, J. (concurring)—I concur with the result of the majority but not its reasoning. While I agree that defendants should have been allowed to gather signatures at Alderwood Mall, I believe it is both unnecessary and imprudent to arrive at this result by the constitutional analysis adopted by the majority.

In holding Const. art. 1, § 5 may be used by one individual to enforce action against another, the majority has made an unprecedented change in the application of this state's constitution. It interprets the constitution in a way which has never been done since that document was adopted in 1889. It does so without the slightest historical warrant: No case is cited, there is reference to no authority. The majority simply says, "We choose to follow [this] approach." That two other jurisdictions have chosen to adopt the approach and that some commentators have written on the subject, while interesting, is less than per-

suasive as to the Washington Constitution. *Robins v. Pruneyard Shopping Center,* 23 Cal. 3d 899, 592 P.2d 341, 153 Cal. Rptr. 854 (1979); *State v. Schmid,* 84 N.J. 535, 423 A.2d 615 (1980); Glennon & Nowak, *A Functional Analysis of the Fourteenth Amendment "State Action" Requirement,* 1976 Sup. Ct. Rev. 221; Project, *Toward an Activist Role for State Bills of Rights,* 8 Harv. C.R.–C.L.L. Rev. 271 (1973).

While this court has in the past declared the substance of the Washington Constitution may differ from that of similar provisions of the United States Constitution (see cases cited by majority opinion), this is the first time the court has held the Declaration of Rights in our constitution is designed not just to protect the individual from government but that it may also be used by one individual against the other. It is constitution–making by the judiciary of the most egregious sort.

That the Bill of Rights of the United States was adopted to protect individual rights against the government is standard constitutional doctrine. It has also been the view relative to state bills of rights. H. Rottschaefer, *American Constitutional Law* § 305 (1939); E. McLain, *Constitutional Law in the United States,* § 205, at 294 (2d ed. 1910). Most particularly, this was the view at the time of the adoption of the Washington Constitution. *See, e.g.,* T. Cooley, *Constitutional Law,* ch. 12, at 219 (3d ed. 1898); J. Hare, *American Constitutional Law,* Lecture 24, at 507 (1889); J. Pomeroy, *Constitutional Law* § 230 (10th ed. 1888); Letter from Territorial Governor Eugene Semple to S.R. Frazier (Feb. 10, 1889) (deposited in the Washington State Archives).

While "a very narrow range of rights against individuals . . . have been read into the [United States] Constitution", this does not detract from the general proposition that the "Bill of Rights, designed to protect personal liberties, was directed at rights against governmental authority, not other individuals." *United States v. Guest,* 383 U.S. 745, 771, 16 L. Ed. 2d 239, 86 S. Ct. 1170 (1966) (Harlan, J., concurring

in part, dissenting in part). *See* L. Tribe, *American Constitutional Law,* ch. 18 (1978). *See also* Note, *A Private Mall Becomes a Public Hall,* 26 Loy. L. Rev. 739 (1980).

Const. art. 1 is designated as a Declaration of Rights (*see* Meany & Condon, *Washington's First Constitution,* 9 Wash. Hist. Q. 145 (1918), *reprinted in* E. Meany & J. Condon, Washington's First Constitution, 1878, and Proceedings of the Convention 19 (1924)), not the rights of one person against another, but of the people against their government. This subject has been considered in two articles in the Washington Law Review. In Countryman, *Why a State Bill of Rights?,* 45 Wash. L. Rev. 454, 473 (1970), the query is raised as to whether we might not need a new state bill of rights directed toward those "'private governments' against whose excesses we are also in need of [protection]." It is not contended that these additional guaranties of the rights of private individuals against other private entities presently exist in article 1 of our present state constitution, only that a new bill of rights might be appropriate. *See* Morris, *New Horizons for a State Bill of Rights,* 45 Wash. L. Rev. 474 (1970).

It is true, as the majority states, that Const. art. 1, § 5 does not expressly mention "state action". It is equally true that until today this court had not even hinted article 1, section 5 was concerned with other than the protection of individual rights against state action.

In *Fine Arts Guild, Inc. v. Seattle,* 74 Wn.2d 503, 512, 445 P.2d 602 (1968), we said:

> We have, however, in varying contexts, applied the provisions of Const. art. 1, § 5, and the first amendment to the United States Constitution in pari materia and inferentially interchangeable.

(Footnote omitted.) In *Federated Publications, Inc. v. Kurtz,* 94 Wn.2d 51, 58, 615 P.2d 440 (1980), we recently noted "The state equivalent to the First Amendment is Const. art. 1, § 5 . . ." There is nothing in our constitution, in our constitutional history, in the opinions of this court or in the writings of commentators on our constitution which

gives credence to the position of the majority.

This new approach to our constitution has not been briefed by the parties either as to its rationale or its consequences. It is inconceivable to me that we should make such a fundamental shift in our constitutional perspective under this circumstance, particularly in view of our consistent statements made as to Const. art. 1, § 5—the latest as recently as last year.

If the citizens of Washington wish their constitution to be used as a sword by individuals against individuals in addition to being used as a shield against the actions of the state, there is a means by which this can be done. Const. art. 23. This court, however, should not expand its views of the fundamental meaning of the constitution—and thus the power of the court—at the expense of the will of the people. *See* Deukmejian & Thompson, *All Sail and No Anchor—Judicial Review Under the California Constitution,* 6 Hastings Const. L.Q. 975 (1979). As it articulates constitutional rights it "chooses" to declare, the majority also arrogates to the court powers undreamed of by those who wrote and those who adopted our constitution.

The majority opinion represents a determination by the court that it, instead of the legislature, will settle conflicting interests among citizens and that it will accomplish this by what it chooses to call a constitutional basis. This is in marked contrast to what had formerly been the responsibility of the court: the legislature would allocate interests among competing groups and individuals and the court would then decide, if an action were brought, whether in this legislative allocation a constitutional right of a citizen against the State had been violated. Now the court will be able to dispense with the inconvenience and cumbersomeness of legislative activity.

Put another way, the majority proposes that the scope of article 1, section 5 shall no longer be limited by such an outmoded doctrine as "state action" which had been a prerequisite to court action. Now there is no limit to the range of wrongs which this court may right—subject only to the

court's notion of balancing interests. With acceptance of the majority position, the need for a statute will become secondary and the "encourage[ment] in American life" of the "private structuring of individual relationships and [the] repair of their breach" can be set aside for the beneficent guardianship of the state courts. *See Boddie v. Connecticut,* 401 U.S. 371, 376, 28 L. Ed. 2d 113, 91 S. Ct. 780 (1971); Burke & Reber, *State Action, Congressional Power and Creditors' Rights: An Essay on the Fourteenth Amendment,* 46 S. Cal. L. Rev. 1003, 1014–17 (1973); L. Tribe, *American Constitutional Law,* ch. 18, at 1149 (1978). Today, the term "imperial judiciary" takes on new meaning. *See* N. Glazer, *Towards an Imperial Judiciary?,* 41 The Public Interest 104 (Fall, 1975).

Nevertheless, I agree with the majority that the activity involved in this case was a reasonable restriction on the use of the Alderwood Mall by plaintiff and was not of such a nature as to constitute an uncompensated "taking" of private property. As noted in *Pruneyard Shopping Center v. Robins,* 447 U.S. 74, 81, 64 L. Ed. 2d 741, 100 S. Ct. 2035 (1980), a "State in the exercise of its police power may adopt reasonable restrictions on private property so long as the restrictions do not amount to a taking without just compensation or contravene any other federal constitutional provision." Rather than emasculate the state action requirement from the Declaration of Rights, however, I would hold that the activity engaged in here by the defendants is authorized by Const. art. 2, § 1(a) (amendment 7), RCW 29.79, and the cases decided by this court. *See, e.g., State ex rel. Evich v. Superior Court,* 188 Wash. 19, 61 P.2d 143 (1936); *State ex rel. Case v. Superior Court,* 81 Wash. 623, 143 P. 461 (1914).

The right to exclude others is an essential stick in the bundle of property rights. *Kaiser Aetna v. United States,* 444 U.S. 164, 62 L. Ed. 2d 332, 100 S. Ct. 383 (1979). It is well established, however, that "not every destruction or injury to property by governmental action has been held to be a 'taking' in the constitutional sense." *Armstrong v.*

*United States,* 364 U.S. 40, 48, 4 L. Ed. 2d 1554, 80 S. Ct. 1563 (1960). As Justice Holmes stated in *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 67 L. Ed. 322, 43 S. Ct. 158, 28 A.L.R. 1321 (1922),

> Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law. As long recognized, some values are enjoyed under an implied limitation and must yield to the police power.

*Pennsylvania Coal Co.,* at 413.

The police power of the State is an attribute of its sovereignty, an essential element of the power to govern. The power exists without declaration, and the only limitation upon it is that it must reasonably tend to promote some interest of the State, and not violate any constitutional mandate. *State v. Dexter,* 32 Wn.2d 551, 554, 202 P.2d 906, 13 A.L.R.2d 1081 (1949). In *Maple Leaf Investors, Inc. v. Department of Ecology,* 88 Wn.2d 726, 565 P.2d 1162 (1977), the court said that

> The question essentially is one of social policy which requires the balancing of the public interest in regulating the use of private property against the interests of private landowners not to be encumbered by restrictions on the use of their property.

*Maple Leaf Investors,* at 731.

The overriding public interest here involved is to make the initiative process available to all. The court recognized in *State ex rel. Brislawn v. Meath,* 84 Wash. 302, 317–18, 147 P. 11 (1915), that the role created for the people by amendment 7 was closely akin to that of a fourth branch of government. *See also Stetson v. Seattle,* 74 Wash. 606, 134 P. 494 (1913). It has expressed the conviction that the initiative and referendum constitutional and statutory provisions should be liberally construed, to the end that these popular legislative rights of the people should be preserved and rendered effective. *State ex rel. Booth v. Hinkle,* 148 Wash. 445, 451, 269 P. 818 (1928), and cases cited therein.

It should be noted that the initiative process is not a "right" against government in the sense of Const. art. 1, § 5. Rather, amendment 7 is a declaration by the people in their constitution that they are part of the legislative process. Amendment 7 declares not that the people have a right against government but that the people are part of the apparatus of government—the legislative branch. As a part of government the initiative process may be exercised, as may other aspects of government, only in such a way as not to restrict the use of private property so as to amount to a taking. *Maple Leaf Investors, Inc. v. Department of Ecology, supra.*

Given the importance of the initiative procedure, I do not feel that the plaintiff's property rights were unreasonably restricted. The property remains in the possession of its owners. The State does not appropriate it or demand exclusive use of it. The people merely desire access to gather signatures on an initiative petition, an integral part of this state's political process. Implicit in the initiative process is the need to gather signatures in a manner which does not violate or unreasonably restrict the rights of private property owners. To bar the reasonable activity engaged in here by defendants would be an unwarranted weakening of the vital interest of the State. Defendants should have been allowed to collect their signatures at Alderwood Mall.

STAFFORD, J. (dissenting)—I agree with the objection of the concurrence to the majority's method of resolving this case. For many of the same reasons, however, I disagree with the use, by the concurrence, of Const. art. 2, § 1(a) (amendment 7) to establish a new constitutional right which authorizes persons gathering signatures on initiative petitions to go onto private property and which leaves owners of private property powerless to exclude them.

I agree with the concurrence that "a State in the exercise

of its police power may adopt reasonable restrictions on private property so long as the restrictions do not amount to a taking without just compensation or contravene any other federal constitutional provision." If the State had in any manner imposed such a restriction I would reverse the trial court, but no such limitation has ever been enacted. Nevertheless, the concurrence would, without either analysis or construction of amendment 7, establish a new restriction on property rights. The resulting restriction then would be carved into constitutional granite.

Courts should extend constitutional concepts and doctrines only with the utmost care. Once established they may be changed or abrogated only with great difficulty and the capacity for "experimentation", lauded by the majority, will be lost. Further, such constitutional rights should have a clear limit beyond which they are inapplicable.[10] One value of the "state action" requirement, which now appears to have been abrogated, was that it imposed such a limit to the reach of constitutional rights regarding free expression. The temptation to interpret our constitution differently from corresponding federal provisions also destroys the usefulness of a vast body of precedence which would formerly have helped us to maintain stability and predictability in our own law.

To paraphrase the concurrence: Courts should not dispense with the inconvenience and cumbersomeness of legislative activity by simply articulating those new constitutional rights they choose to declare.

Since citizens have nowhere been given the right, either constitutionally or statutorily, to collect initiative signa-

---

[10]One problem with the constitutional interpretation by both the majority and the concurrence is that neither seems to have a logical stopping point. Counsel for the defendants (petitioners) conceded in oral argument that, if a private person's home was on the busiest corner of the city and hence the best available place from which to gather signatures, the collector's alleged constitutional right would compel the homeowner to allow a card table to be set up on his front lawn. Neither the majority nor the concurrence's resolution of this case appears to preclude such an absurd extension of the new found right to collect signatures on private property (and the concomitant reduction in basic property rights).

tures on private property, I must dissent. I would affirm the trial court.

BRACHTENBACH, C.J., and HICKS and DIMMICK, JJ., concur with STAFFORD, J.