[No. 20254-9-II.    Division Two.    October 24, 1997.]

INITIATIVE 172 (FAIR PLAY FOR WASHINGTON), ET AL., *Appellants*, v. WESTERN WASHINGTON FAIR ASSOCIATION, *Respondent*.

*Shawn T. Newman*, for appellants.

*John W. Fuhrman* of *Fuhrman & Wright, P.S.*, for respondent.

ARMSTRONG, J. — Supporters of two initiatives sought to collect signatures at a privately owned and operated fair. The fair attempted to (1) limit the supporters to a specific area of the fairgrounds, the "free speech area," and (2) limit the duration of the solicitation to 4 days of the 17-day event. The supporters moved for an injunction, alleging that the restriction denied them their initiative rights under the Washington Constitution. The trial court concluded that limiting the collection of signatures to the

"free speech area" was a reasonable restriction, but ordered that the collection could continue for the duration of the fair. Because the supporters have not demonstrated that collecting signatures in the "free speech area" is a "substantial injury" to their initiative rights, we affirm, holding that the trial court did not abuse its discretion.

## FACTS

The supporters of Initiatives 172 and 173 sought to collect signatures to qualify their measures for the 1996 general election ballot.[1] The supporters contacted the Western Washington Fair Association (Association) and requested permission to collect petition signatures during the Western Washington Fair, also known as "The Puyallup Fair" (Fair). The Association is a private, nonprofit corporation that owns the fairgrounds and operates a private fair lasting about 17 days in Puyallup, Washington. It also operates other events on the fairgrounds during the year.

In each of the past several years, more than 1.3 million people have attended the Fair. Visitors to the Fair pay admission to gain access to various arts, crafts, educational, agricultural, and livestock exhibits and displays. Under the Fair's rules, all product sales and dissemination of information must be made from a booth display or in a specifically designated area. No roving solicitation, whether commercial, nonprofit, religious, political, or otherwise, is permitted throughout the fairgrounds. The Association seeks to provide a safe, uncongested atmosphere where fairgoers can freely walk the fairgrounds

---

[1]Initiative to the Legislature No. 172 ("Shall state and local government be prohibited from granting 'preferential treatment' based on race, sex, ethnic or sexual minority status?") did not qualify for the ballot. 2 LAWS OF 1996, HISTORY OF INITIATIVES, at 1864. Initiative 173 ("Shall the state pay scholarship vouchers for primary and secondary students to attend voucher-redeeming private or public schools of choice?") qualified for the ballot but was rejected by the voters. 2 LAWS OF 1996, HISTORY OF INITIATIVES, at 1864; The Honorable Mike Lowry, Governor, *Proclamation Announcing Failure of Initiative 173* (Dec. 5, 1996) (on file at the Office of the Governor).

and independently choose to visit a specific booth, exhibit, or display.

According to an assistant director of the Washington State 4-H, the Fair is also an "umbrella facility" for the 4-H Program, serving as the site of the Washington State 4-H Fair. The State 4-H Fair receives significant public funding from the State for its operations. The Fair and the Association, however, receive no funds or compensation from either the State or the 4-H Fair and have no direct ties to any governmental organization.

The 4-H Fair does not have a lease with the Fair, but rather has agreed to hold its exhibits on the fairgrounds; it operates as the Fair's guest. As such, the Fair provides free services, such as display space, electricity, and equipment to the 4-H Fair. The 4-H Fair, however, is simply another exhibitor at the Fair and must adhere to all exhibitor rules. Other governmental entities, such as the State Patrol, also set up exhibits at the Fair, as do various private groups.

In response to the supporters' request to collect signatures, the Association prohibited them from freely roaming the Fair and collecting signatures. But the Association told the supporters that it had a fixed location, called the "free speech area," where they would be allowed to collect signatures during the Fair. This area is located under the overhang of the Fair's Pavilion and is near one of the main fairground entrances.[2] The space is available to any person or organization that applies in advance, on a first come, first served basis, and agrees to abide by the Association's rules.

The supporters sought an order enjoining the Association from "interfering" with their efforts to collect signatures during the run of the Fair.[3] The trial court found that: (1) the Association is a privately owned

---

[2]According to Robert E. Carlson, the Fair's General Manager, the "free speech area" is "very visible" and is situated near the entrance "which historically admits more visitors to the fair grounds than any of the other four gates."

[3]The supporters assert only their initiative rights under CONST. art. II, § 1(a).

corporation that owns and operates the fairgrounds;[4] and (2) limiting the collection of signatures to the "free speech area" was a reasonable restriction. But the court ordered that the collection could continue for the duration of the Fair. The initiative supporters appeal.

## ANALYSIS

Although this matter is moot, we decide the case because the Fair imposes the same restrictions each year. Thus, the case raises issues "of continuing and substantial public interest." *Dioxin/Organochlorine Ctr. v. Pollution Control Hearings Bd.*, 131 Wn.2d 345, 351, 932 P.2d 158 (1997).

Parties seeking an injunction must demonstrate that: (1) they have a clear legal or equitable right; (2) they have a well-grounded fear of immediate invasion of that right; and (3) the acts they seek to enjoin are causing or will cause actual and substantial injury to them. *King v. Riveland*, 125 Wn.2d 500, 515, 886 P.2d 160 (1994). We review the trial court's granting or denial of an injunction for abuse of discretion. *Federal Way Family Physicians, Inc. v. Tacoma Stands Up for Life*, 106 Wn.2d 261, 264, 721 P.2d 946 (1986). We determine if the trial court's decision is arbitrary, based on untenable grounds, or is manifestly unreasonable. *Federal Way Family Physicians,* 106 Wn.2d at 264.

Collecting "initiative signatures in some manner, at some place, is a constitutionally guaranteed practice" under Amendment 7 of the Washington Constitution. *Alderwood Assocs. v. Washington Envtl. Council*, 96 Wn.2d 230, 239, 635 P.2d 108 (1981) (Utter, J., plurality op.); CONST. art. II, § 1(a). But this guaranteed practice is limited. When initiative supporters collect signatures on private property, the supporters may "not violate or unreasonably restrict the rights of [the] private property

---

[4]This finding is unchallenged and therefore a verity on appeal. *E.g., Fisher v. Parkview Properties, Inc.*, 71 Wn. App. 468, 475, 859 P.2d 77 (1993).

owners." *Southcenter Joint Venture v. National Democratic Policy Comm.*, 113 Wn.2d 413, 428-29, 780 P.2d 1282 (1989). The Puyallup Fair is on property owned and operated by the Western Washington Fair Association, a private, non-profit corporation. Therefore, the supporters may "not violate or unreasonably restrict" the Association's rights. *Southcenter Joint Venture*, 113 Wn.2d at 428-29.[5]

■ Here, the Association wants to provide a safe, un-congested atmosphere where fairgoers can freely walk the fairgrounds and independently choose to visit a specific booth, exhibit, or display. Accordingly, the Association prohibits roving solicitation of both a commercial and a noncommercial nature. The Association provides, however, space in the "free speech area" to any person or organization that applies in advance and agrees to abide by the Association's rules. This area provides groups with a high-visibility location and the opportunity to obtain numerous signatures for their particular initiative causes. The supporters have not shown that the restriction to the "free speech area" prevents or even affects their ability to solicit signatures. Thus, they have not demonstrated a "substantial injury" resulting from the Association's actions. Accordingly, the trial court did not abuse its discretion.

■ But the supporters claim that the Fair is a "public forum" because it includes the publicly-funded Washington State 4-H Fair. Without citation to authority, the supporters argue that the presence of the 4-H Fair constitutes a joint venture with the State, thereby creating governmental action that subjects the Fair to State constitutional guarantees "of free speech, assembly, initiative, etc."[6] We disagree.

---

[5]Both parties have engaged in a lengthy discussion of the "balancing test" in *Alderwood*. But as recognized by Justice Utter in *Southcenter Joint Venture*, that test has been "abandon[ed]." *Southcenter Joint Venture*, 113 Wn.2d at 435 (Utter, J., dissenting); *see also Southcenter Joint Venture*, 113 Wn.2d at 425-26 (majority declining to balance free speech and private property interests).

[6]As previously noted, the supporters assert only their initiative rights under CONST. art. II, § 1(a). We do not decide their rights under the free speech and assembly provisions of the Washington and U.S. Constitutions.

The 4-H Fair operates as the guest of the Fair; it is simply another exhibitor at the Fair and must adhere to all exhibitor rules. Neither the Fair nor the Association receives any funds or compensation from the State or the 4-H Fair. The Association also has no direct ties to any governmental organization. The presence of the 4-H Fair, therefore, does not alter the Fair's status.

The supporters also cite two United States Supreme Court opinions and assert that the Fair improperly denied them the opportunity to freely roam the fairgrounds and collect signatures. *Meyer v. Grant*, 486 U.S. 414, 108 S. Ct. 1886, 100 L. Ed. 2d 425 (1988); *Heffron v. International Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 101 S. Ct. 2559, 69 L. Ed. 2d 298 (1981). Both cases are distinguishable.

*Meyer* concerned a challenge to a Colorado statute prohibiting the act of paying circulators of initiative petitions. The Supreme Court stated that the solicitation of signatures was "core political speech," applied the strict scrutiny test, and held the law unconstitutional. *Meyer*, 486 U.S. at 422. Here, we have no state actor attempting to burden speech. *See Southcenter Joint Venture*, 113 Wn.2d at 430 ("[F]ree speech provision of our state constitution protects an individual only against actions of the State."). In *Heffron*, the Supreme Court held that the Minnesota State Fair, a public corporation, could confine distribution, selling, and fund-raising activities to fixed locations. *Heffron*, 452 U.S. at 654. Unlike the Minnesota State Fair, the Fair and the Association are privately owned and operated. Further, because the Minnesota fair officials never attempted to prevent Hari Krishna members from mingling and speaking their views, that issue was never before the Court. *Heffron*, 452 U.S. at 643-44. Thus, *Heffron* is no help to the supporters.

We affirm.

Bridgewater, A.C.J., and Morgan, J., concur.