66 N.Y.2d 496 (1985)
SHAD Alliance et al., Respondents,
v.
Smith Haven Mall, Appellant.
Court of Appeals of the State of New York.
Argued October 15, 1985.
Decided December 19, 1985.
Robert S. Smith and Audrey S. Feinberg for appellant.
Christopher A. Hansen and Steven R. Shapiro for respondents.
Edward R. Korman and Naomi Siegel for The New York Government Affairs Committee of the International Council of Shopping Centers, amicus curiae.
Judges JASEN, SIMONS, KAYE and ALEXANDER concur with Judge TITONE; Judge JASEN concurs in a separate concurring opinion; Chief Judge WACHTLER dissents and votes to affirm in another opinion in which Judge MEYER concurs.
*498 TITONE, J.
All members of the court agree that the right to free expression is one of this Nation's most cherished civil liberties. We differ solely on the question whether article I, § 8 of our State Constitution,[1] considered in light of both history and modern conditions, precludes the owner of a private shopping mall from enforcing a blanket no-handbilling policy and compels the owner to permit use of the mall for the distribution of leaflets opposing nuclear energy. As the court concludes that article I, § 8 only limits State action, not present here, the order of the Appellate Division should be reversed and a declaration made in defendant's favor.

I
Smith Haven Mall, a typical suburban shopping center located in central Suffolk County, Long Island, is privately owned and operated by defendant Prudential Insurance Company of America. It consists of 97 acres, of which 85 acres are dedicated to parking facilities, and contains three major department stores and approximately 125 other stores, restaurants, and service businesses, all connected by pedestrian walkways. Each of the commercial establishments is a tenant, paying rent for the use of space.
The Mall has consistently and nondiscriminatorily prohibited all leafletting, and all types of political activities or gatherings. To maintain and foster an environment conducive to the business of its tenants, the Mall has permitted only those types of events which will generate goodwill, consumer interest, and patronage. On some occasions the Mall has permitted local officials to park mobile vans in its parking lot to offer public services such as advice to senior citizens and veterans, and blood and glaucoma tests. All such activities are conducted from within the vans, and it bears emphasis that in no circumstances does the Mall permit any kind of campaigning, *499 petitioning or distributing of leaflets in connection with these activities.[2]
In July and August of 1980, individuals representing plaintiffs SHAD and Paumanok, organizations that oppose, through what they describe as "education and non-violent action," the use of nuclear energy to generate electricity, including plaintiffs Glaser and Cina, came to the Mall, and, without obtaining permission from the Mall owner, proceeded to hand out leaflets opposing the use of nuclear power and encouraging people to attend various demonstrations concerning the Shoreham Nuclear Power Plant. On both occasions, a security officer informed them of the Mall's policy prohibiting leafletting on the premises and directed them to cease doing so.
Plaintiffs then brought this action against the Mall. Their complaint alleges claims under the New York Constitution only and seeks declarative and injunctive relief compelling the Mall to permit them to distribute leaflets.
On cross motions for summary judgment, Special Term, though acknowledging that the "Mall is private property and operated for * * * commercial benefit", held that the free speech provision contained in NY Constitution, article I, § 8 invalidated the no-handbilling policy and compelled the Mall to permit plaintiffs to distribute leaflets, subject to the imposition of "reasonable regulations concerning time, place and manner" (118 Misc 2d 841, 843, 849).
The Appellate Division affirmed by a sharply divided court. The majority elaborated on Special Term's theme, reading the State Constitution to "require that the mall be enjoined from prohibiting the distribution of leaflets on its premises, subject only to the adoption of reasonable regulations as to the time, place and manner in which such activities may be carried out" (106 AD2d 189, 190). The dissent urged that the result could not be reached "without ignoring the history of the Bill of Rights and its purpose, and without undertaking to rewrite the Constitution" (106 AD2d, at p 205). We now reverse.

II
It is, of course, now beyond dispute that a shopping center owner's adoption and enforcement of a blanket no-handbilling *500 policy does not infringe any rights under the First Amendment to the United States Constitution (Hudgens v NLRB, 424 US 507; Lloyd Corp. v Tanner, 407 US 551) because the actions of the owner do not constitute the State action necessary to trigger Federal constitutional protections.[3]
Plaintiffs, therefore, urge us to construe our State Constitution's free speech provision more broadly. The linchpin of their argument is that no State action requirement exists or should exist under our State Constitution so that the free speech provision may be read as imposing an affirmative limitation on private conduct. The history of the State action requirement, traditional usage and understanding and contemporary approaches to constitutional adjudication, lead us to a contrary conclusion.
The free speech provision now found in NY Constitution, article I, § 8 was added in 1821 as part of the New York Bill of Rights, which was essentially based on the Bill of Rights contained in the United States Constitution (Chaffee, Free Speech in the United States, at 4-6; 2 Chester, Legal & Judicial History of New York, at 41, 121-122; 1 Lincoln, Constitutional History of New York, at 733-734, 739-740). The Reports of the Proceedings and Debates at the 1821 Convention plainly indicate that the New York Bill of Rights, like its Federal counterpart, was intended by its drafters to serve as a check on governmental, not private, conduct (Carter and Stone, Reports of the Proceedings and Debates of the Convention of 1821, at 163, 172). General Root, for example, explicitly directing himself to the "4th clause, respecting the liberty of speech and the press * * * said it was doubtless intended to secure the citizen as well against the arbitrary acts of the legislature, as against those of the judiciary" (id., at 167).[4]
*501 Language almost identical to article I, § 8 was inserted into the Connecticut Constitution in 1818, three years prior to New York's Constitutional Convention in 1821 (Cologne v Westfarms Assoc., 192 Conn 48, 59-60, 469 A2d 1201, 1207). The Connecticut Supreme Court found that a "review of [its] origin discloses no evidence of any intention to vest in those seeking to exercise such rights as free speech and petition the privilege of doing so upon property of others" (id., 192 Conn, at p 62, 469 A2d, at p 1208). Other courts have generally employed a similar approach (e.g., Pendrell v Chatham Coll., 386 F Supp 341, 344 ["Article I, section 7 of the Constitution of Pennsylvania * * * imposes a limitation upon the power of the State to interfere with freedom of the press and freedom of speech, but contains no self-executing private cause of action, express or implied"]; State v John W., 418 A2d 1097, 1101 [Me] ["Both article I, § 4 of the Maine Constitution and the first amendment of the United States Constitution protect the people against governmental encroachment on their freedom of speech"] [emphasis supplied]; see also, State v Marley, 54 Hawaii 450, 461, 509 P2d 1095, 1103; People v Sterling, 52 Ill 2d 287, 287 NE2d 711; Commonwealth v Hood, 389 Mass 581, 452 NE2d 188; Commonwealth v Noffke, 376 Mass 127, 379 NE2d 1086; Woodland v Michigan Citizens Lobby, 423 Mich 188, 378 NW2d 337; State v Felmet, 302 NC 173, 273 SE2d 708; Lenrich Assoc. v Heyda, 264 Ore 122, 504 P2d 112; Logan Val. Plaza v Amalgamated Food Employees Union, 425 Pa 382, 227 A2d 874, revd 391 US 308; United States Supreme Court reversal expressly overruled in Hudgens v NLRB, 424 US 507, supra; Western Pa. Socialist Workers 1982 Campaign v Connecticut Gen. Life Ins. Co., 335 Pa Super Ct 493, 485 A2d 1, lv granted, ___ Pa ___, 497 A2d 607; but see, Batchelder v Allied Stores Intl., 388 Mass 83, 445 NE2d 590 [4-3 decision] [finding a State constitutional right to solicit signatures on nominating petitions under provision of State Constitution guaranteeing free and equal elections; reach of free speech provision left open]).[5]
*502 On the two occasions that we considered the free speech claims of persons who, like the plaintiffs here, sought to engage in expressive activities on private property, we permitted private property owners to exclude such persons from their premises (People v Bush, 39 N.Y.2d 529; Watchtower Bible & Tract Socy. v Metropolitan Life Ins. Co., 297 N.Y. 339, cert denied 335 US 886). Indeed, in People v Bush (supra), we cited both Hudgens v NLRB (supra) and Lloyd Corp. v Tanner (supra) with approval. Thus, it is firmly established that the State and Federal constitutional guarantees of freedom of speech protect the individual against action by governmental authorities, not by private persons (see, Sunshine Book Co. v McCaffrey, 4 AD2d 643, 647; Reiter v American Legion, 189 Misc 1053, 1057, affd 273 App Div 757; cf. Under 21 v City of New York, 65 N.Y.2d 344, 360-361; Matter of Wilson, 59 N.Y.2d 461, 476-477).
These observations are hardly surprising. That a Bill of Rights is designed to protect individual rights against the government is standard constitutional doctrine (Cooley, Constitutional Limitations, at 36-37 [rev ed 1972]; Hand, The Bill *503 of Rights [Harvard Univ Press 1958]; Rottschaeffer, American Constitutional Law § 305 [1939]; Tribe, American Constitutional Law, at 1147, n 1), and, while the drafters of the 1821 free speech clause may not have envisioned shopping malls, there can be no question that they intended the State Constitution to govern the rights of citizens with respect to their government and not the rights of private individuals against private individuals. That intent is consistent with modern constitutional theory as well as the understanding prevalent in 1821 (see, Sharrock v Dell Buick-Cadillac, 45 N.Y.2d 152, 160 [absence of express State action requirement does not dispense with this constitutional predicate]; Cooley, Constitutional Law ch 12, at 219 [3d ed 1898]; McLain, Constitutional Law § 205, at 294 [2d ed 1910]; Pomeroy, Constitutional Law § 230 [10th ed 1888]). Indeed, this fundamental concept concerning the reach of constitutionally guaranteed individual rights is not only deeply rooted in constitutional tradition, it is at the foundation of the very nature of a constitutional democracy.
The State action requirement, consistently recognized and reaffirmed in our decisions (see, e.g., Under 21 v City of New York, 65 N.Y.2d 344, 360-361, supra; Matter of Wilson, 59 N.Y.2d 461, 476-477, supra), performs a vital function. Actions of the Federal Government are limited by the Federal Constitution's reservation to State governments of all powers not expressly granted it (see, Board of Educ. v Nyquist, 57 N.Y.2d 27, 43, n 5). State governments are not similarly restrained (ibid.). State constitutional provisions, therefore, protect individual liberty by limiting the plenary power of the State over its citizens (see, Bellanca v State Liq. Auth., 54 N.Y.2d 228, 235-236, cert denied 456 US 1006; Grad, State Bill of Rights in Constitutions of the United States: National and State, at 117-118 [1980]; Rankin, State Constitutions: The Bill of Rights, at 4-5). Thus, State action is a crucial foundation for both private autonomy and separation of powers (see, Tribe, American Constitutional Law, op. cit., at 1149-1151).
No one disputes that we have the power, indeed the duty, to assure that the protections provided by our State Constitution remain meaningful in light of emerging needs and changing social values (see, e.g., Bellanca v State Liq. Auth., 54 N.Y.2d 228, supra; Cooper v Morin, 49 N.Y.2d 69; People v Settles, 46 N.Y.2d 154, 161; People v Isaacson, 44 N.Y.2d 511, 519-520; People v Hobson, 39 N.Y.2d 479). But this can never be "made an excuse for imposing the individual beliefs and philosophies *504 of the judges upon other branches of government," for it actually "shackles progress, and breeds distrust and suspicion of the courts" (Cardozo, Nature of the Judicial Process, at 91). A State Constitution is a document defining and limiting the powers of State government, not a blueprint for the judiciary to turn what it perceives to be "desirable" social policies into law (see, Berger, "The Supreme Court as a Legislature": A Dissent, 64 Cornell L Rev 988; Deukmejian and Thompson, All Sail and No Anchor  Judicial Review Under the California Constitution, 6 Hast Const LQ 975; Horowitz, Courts and Social Policy, at 19; Thayer, Origin and Scope of American Doctrine of Constitutional Law, 7 Harv L Rev 129, 135).
We agree with the dissent that the willingness of courts to interpret constitutional provisions in light of changing conditions has safeguarded both our Constitutions and the freedom they protect (dissenting opn, at p ___). There is a profound difference, however, between interpreting constitutional provisions and dispensing with constitutional requirements. In circumstances such as these, where State action has historically been a component of the constitutional inquiry, the principled "modern" approach would not dispense with the requirement, but rather would question how it is appropriately defined given the novel context (see generally, Tribe, op. cit., at 1147-1174; Nowak-Rotunda-Young, Constitutional Law, at 497-508 [2d ed 1983]; Sharrock v Dell Buick-Cadillac, 45 N.Y.2d 152, 160-161, supra; Dworkin, A Matter of Principle, at 386-389 [1985]; Alderwood Assoc. v Washington Envtl. Council, 96 Wn 2d 230, 247 et seq., 635 P2d 108, 118 et seq. [Dolliver, J., concurring]; Woodland v Michigan Citizens Lobby, 423 Mich 188, 378 NW2d 337, supra).[6]
It would be a "demonstration of judicial arrogation" (Montgomery v Daniels, 38 N.Y.2d 41, 53) and it "would neither serve *505 the purposes of orderly government nor honor the role of the judiciary to lay aside standards of judicial review recently held appropriate" (Board of Educ. v Nyquist, 57 N.Y.2d 27, 49, n 9, supra). Abrogation of a State action requirement, as urged here by plaintiffs, would have broad and mischievous consequences because it would signify "a determination by the court that it, instead of the legislature, will settle conflicting interests among citizens and that it will accomplish this by what it chooses to call a constitutional basis" (Alderwood Assoc. v Washington Envtl. Council, 96 Wn 2d 230, 250, 635 P2d 108, 119, supra [Dolliver, J., concurring]), which is then beyond legislative reach. A disciplined perception of the proper role of the judiciary, and, more specifically, discernment of the reach of the mandates of our State Constitution, precludes us from casting aside so fundamental a concept as State action in an effort to achieve what the dissent perceives as a more socially desirable result.

III
We now turn to the question whether a shopping mall owner's enforcement of a blanket no-handbilling policy constitutes State action within the meaning of our State Constitution. If there be no State action, our inquiries must end (see, Nowak-Rotunda-Young, Constitutional Law, op. cit., at 497).
In the context of a due process challenge to private action, we have commented that, despite its outward simplicity as a concept, State action is in fact an elusive principle not reducible to ritualistic incantations or precise formalism (see, Sharrock v Dell Buick-Cadillac, 45 N.Y.2d 152, 158, supra [citing Burton v Wilmington Parking Auth., 365 US 715, 722]; see also, Tribe, American Constitutional Law, op. cit., at 1148-1149). The factors to be considered in determining whether it has been shown include: "the source of authority for the private action; whether the State is so entwined with the regulation of the private conduct as to constitute State activity; whether there is meaningful State participation in the activity; and whether there has been a delegation of what has traditionally been a State function to a private person (Melara v Kennedy, 541 F.2d 802, 805). As the test is not simply State involvement, but rather significant State involvement, satisfaction of one of these criteria may not necessarily be determinative to a finding of State action" (Sharrock v Dell Buick-Cadillac, supra, at p 158).
*506 The relevant inquiry in this case thus becomes the degree to which the State has involved itself in the enforcement of private property rights against individuals wishing to assert their rights of free expression. If such entanglement or delegation exists, it must then be ascertained whether that entanglement or delegation is sufficient to trigger the protections of the State Constitution (Sharrock v Dell Buick-Cadillac, supra, at p 161).
Plaintiffs have not alleged, much less demonstrated, that any State action is involved here. Smith Haven Mall is not the functional equivalent of a government and its conduct is not the equivalent of governmental conduct (cf. Marsh v Alabama, 326 US 501).[7] To be sure, the shopping mall has taken on many of the attributes and functions of a public forum, as the record demonstrates, but the characterization or the use of property is immaterial to the issue of whether State action has been shown. Nor can the nature of property transform a private actor into a public one (see, Lloyd Corp. v Tanner, 407 US 551, 564-565, supra; Cologne v Westfarms Assoc., 192 Conn 48, 469 A2d 1201, supra; Lenrich Assoc. v Heyda, 264 Ore 122, 124, 504 P2d 112, 114, supra). Rather, the analysis must proceed from the other direction to show significant government participation in private conduct that limits free speech rights. This plaintiffs have failed to do.
Discussion concerning the purportedly unobstructive nature of plaintiffs' activities, the need for inexpensive channels of communication, and the long and rich tradition of free expression in this State begs the question.[8] Such factors are irrelevant to whether State action is present and whether there has been a constitutional infringement. Since there is no State *507 action involved, the provisions of our State Constitution have no role in the resolution of a dispute between private parties.
For these reasons, the order of the Appellate Division should be reversed, with costs, defendant's motion for summary judgment granted, plaintiffs' motion for summary judgment denied, and a declaration made that plaintiffs have no right to distribute leaflets on the defendant's property, contrary to defendant's wishes.
JASEN, J. (concurring).
While I concur in the opinion of Judge Titone, I write to emphasize what I believe to be a critical limitation upon a shopping mall owner's right to exclude expressionist activity. In my view, where the owner of a shopping mall voluntarily and affirmatively creates a public forum or accommodation for expressionist activity, by inviting or permitting members of the general public to engage in noncommercial expressive conduct of a civic or community nature in the common areas of the mall, the owner cannot, at the same time, exclude particular expressionists upon purely discriminatory or arbitrary grounds.
In the first instance, the exclusive choice and control rests with the property owner as to whether a mall shall be open or closed to noncommercial expressionist activity. As is true for any owner of private property, the mall owner may exercise his common-law right to exclude and, thereby, deny access to all individuals whose purpose is other than to engage in shopping, browsing, or other commercial or business activities. (Madden v Queens County Jockey Club, 296 N.Y. 249, 253-254, cert denied 332 US 761.)
However, once the owner of a shopping mall has opened the doors to the public to participate in the exchange of noncommercial ideas, such as to present or partake of cultural, educational, or political activities, the common-law right of the owner to exclude any expressionist from his private property must be limited to nondiscriminatory and nonarbitrary grounds. (See, Matter of United States Power Squadrons v State Human Rights Appeal Bd., 59 N.Y.2d 401, 409-415; Jacobson v New York Racing Assn., 33 N.Y.2d 144, 149-150.) The owner may not exclude any person or group from the common areas of a mall, thus serving as a public forum or accommodation for expressionist purposes, on the basis of race, creed, color, gender, political belief, content of expression, or some other reason repugnant to the law or public policy of this State. (See, Matter of Walker, 64 N.Y.2d 354, 359; *508 Hollis v Drew Theol. Seminary, 95 N.Y. 166, 172.) Of course, a mall owner must still be permitted to regulate the expressive conduct so as to preclude disruption, vulgarity, incitement, or whatever else threatens the health or safety of the patrons or interferes with the primary commercial purpose of a mall. But persons otherwise welcome in a shopping mall for expressionist purposes cannot be excluded solely on the basis of the ideational content of their expression or for some other invidious reason.
It is imperative that this court recognize, not only the absence of a constitutional right of free expression in a privately owned shopping mall, but also the presence of necessary limitations upon the owner's common-law right of exclusion. The principles which mandate these limitations constitute the most fundamental precepts of nondiscrimination and nonarbitrariness which underlie the decisional law, statutes and public policy of this State. (See, e.g., Matter of United States Power Squadrons v State Human Rights Appeal Bd., supra; Jacobson v New York Racing Assn., supra; Madden v Queens County Jockey Club, supra; Woollcott v Shubert, 217 N.Y. 212, 216-219; Aaron v Ward, 203 N.Y. 351, 356-357; Civil Rights Law § 40; Executive Law §§ 292, 296.)
Under the facts presented in this case, it cannot be said that the mall owner acted in a discriminatory or arbitrary fashion. The Smith Haven Mall does provide rent-free space to members of the general public for various expressionist activities, but plaintiffs have sought only to engage in the distribution of handbills which is uniformly prohibited by the mall owner. The absolute prohibition against this particular manner of expression, being an entirely content-neutral and reasonable means of avoiding litter, confrontation and interference with commercial activity, is a nonarbitrary rule which does not violate any antidiscrimination law or public policy. Consequently, in my view, the mall owner's ban against handbilling is a permissible exercise of the common-law right of exclusion.
Chief Judge WACHTLER (dissenting).
The question presented by this case is whether article I, § 8 of our State Constitution, which affirmatively guarantees the freedom of expression, is to be interpreted in light of modern conditions so as to preserve its underlying purpose and vitality. Because the majority opinion unnecessarily restricts the applicability of article I, § 8, and its decision will adversely affect the ability of many persons and organizations to express their views, I dissent.
*509 The Smith Haven Mall (hereinafter the Mall) is the largest retail center in Suffolk County, and is one of only 18 shopping centers in New York which contain over 1 million square feet of interior space (see, Shopping Center World, at 53 [Jan. 1985]). As found by the lower courts, the Mall was designed to encourage the public to congregate and linger, and it contains several large seating areas. Furthermore, the Mall permits its facilities to be used for a large number of public purposes and community activities, including charity auctions, presentations by the Boy Scouts and Girl Scouts, recruitment efforts by universities and the Armed Forces, voter registration drives by the League of Women Voters, promotional events by local towns, and the provision of free health services. Plaintiffs' attempts to distribute leaflets caused no greater interference with the commercial interests of the Mall than any of these activities do. On each of the two occasions when the representatives of the plaintiff organizations came to the Mall, they stood under the portico outside of the main entrance to the Mall's building. Ignored by the majority is the finding by the lower courts  as had been conceded by the Mall in its answer  that the plaintiffs' activities did not in any manner disrupt the Mall's operation.
It is true that the Supreme Court has held that the First Amendment to the United States Constitution does not protect leafletting in a privately owned shopping center (see, Lloyd Corp. v Tanner 407 US 551; Hudgens v NLRB, 424 US 507). The Supreme Court has also acknowledged, however, that a State may recognize broader free speech rights on private property as a matter of State law without violating any Federal constitutional rights of the property owner. In Prune Yard Shopping Center v Robins (447 US 74), the court held that California's recognition of a State constitutional right to solicit signatures for petitions in shopping malls did not infringe upon either the Federal property, due process or First Amendment rights of the mall owners. Addressing the same claims as were made by the shopping center owner in this case, the United States Supreme Court found that this State-imposed limitation on the mall owners' right to exclude was not a taking of their property "`in the constitutional sense'" because there was no indication that it would "unreasonably impair the value or use of their property as a shopping center" (id., at pp 82-83). The Supreme Court specifically noted, in support of this conclusion, that the mall owner was permitted to adopt time, place and manner regulations on the *510 expressive activity so as to minimize any interference with the mall's commercial functions.
Article I, § 8, originally adopted as article VII, § 8 of the New York State Constitution of 1821, states in relevant part: "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press." It is significant that, although the First Amendment of the United States Constitution had been ratified 30 years earlier, the drafters of the free speech section at the 1821 New York State Constitutional Convention chose not to follow the language of that provision.[1] Rather, the language chosen, an affirmative grant of the freedom of expression to all citizens, followed by a separate clause limiting legislative action, was the same as had been adopted in several other States (see, e.g., Pa Const of 1790, art IX, § 7, cited in 8 Swindler, Sources and Documents of United States Constitutions, at 292; Miss Const of 1817, art I, § 6, cited in id., vol 5, at 348; Conn Const of 1818, art I, § 5, cited in id., vol 2, at 145; Me Const of 1819, art I, § 4, cited in id., vol 4, at 315).[2]
The discussion of the free speech provision at the 1821 Convention was confined almost exclusively to that portion of the provision concerning prosecutions for libels (see, Carter and Stone, Reports of the Proceedings and Debates of the Convention of 1821, at 163-173), and the proceedings do not reveal any specific intent with regard to the extent of the *511 "State action" requirement in article I, § 8. While the majority also relies on statements made at the 1967 Constitutional Convention (majority opn, at p 504, n 6), such statements, of course, are entirely irrelevant with regard to the meaning of article I, § 8, adopted 146 years earlier. The absence of any evidence of specific intent which would dictate the result in this case is not surprising. Article I, § 8 was drafted in 1821, long before shopping malls existed. Nor was there any indication then that privately owned property would come to replace town squares and downtown business districts as the public gathering centers in many communities. The majority apparently views constitutional provisions as inflexible law to be interpreted precisely as the framers did at the time of their adoption, and thus finds article I, § 8 inapplicable here, regardless of what present-day circumstances are.
I do not dispute that the history of a constitutional provision is important, and particularly where the proceedings of a constitutional convention reveal a specific and limited purpose for a provision, it may be dispositive (see, e.g., Matter of Esler v Walters, 56 N.Y.2d 306, 313-314). Still, we have before us in this case a brief provision adopted in 1821 after little discussion which, in broad and general terms, sets forth a basic ideal of a democracy. It is largely because of the willingness of courts to interpret such constitutional provisions in light of changing conditions that our freedoms have remained intact and our Constitutions have survived for so long. As stated by Chief Justice Marshall 166 years ago, a Constitution is "intended to endure for ages to come, and, consequently, to be adapted to the various crises of human affairs." (M'Culloch v Maryland, 4 Wheat [17 US] 316, 415.)
In Brown v Board of Educ. (347 US 483), the Supreme Court had to determine whether the equal protection clause in the Fourteenth Amendment required that States provide integrated public schools, rather than ones which were "separate but equal." The court conceded that it could not rely upon the specific intent underlying the provision, as the relevant history was inconclusive as to whether integrated schools were to be required. Instead, the court stated: "[W]e cannot turn the clock back to 1868 when the Amendment was adopted * * * We must consider public education in the light of its full development and its present place in American life throughout the Nation. Only in this way can it be determined if segregation in public schools deprives these plaintiffs of the equal *512 protection of the laws" (347 US, at pp 492-493 [emphasis supplied]).
Here too, given the obvious absence of specific intent, we must consider whether article I, § 8 protects plaintiffs' activities in light of the purpose underlying the provision and the role of large shopping malls in modern society. The proceedings of the 1821 Constitutional Convention reveal that the free speech provision, as an integral part of the Bill of Rights, was proposed primarily to express the view that fundamental principles of individual liberties were safeguarded under New York law (see, Carter and Stone, Reports of the Proceedings and Debates of the Convention of 1821, at 102). There can be little doubt, of course, that the right of free expression is one of our most cherished liberties and is essential for the functioning of a democracy (see, e.g., Matter of Oliver v Postel, 30 N.Y.2d 171, 183; Matter of Steinbeck v Gerosa, 4 N.Y.2d 302, 313-314, appeal dismissed 358 US 39; Cox, Freedom of Expression, at 1-5). The question thus becomes whether protecting the peaceful and orderly exercise of free speech in a large shopping mall is required to uphold the fundamental values enshrined in article I, § 8.
Free speech rights are only valuable if there are adequate means of communication available to those who wish to express a view. Inexpensive channels of communication which provide direct access to large numbers of people are often essential for effective expression (see, e.g., Martin v City of Struthers, 319 US 141, 146). To this end, the distribution of leaflets or handbills in places where people gather has long been recognized as vital for the preservation of a meaningful freedom of speech (see, e.g., Martin v City of Struthers, 319 US, at pp 146-147, supra; Schneider v State, 308 US 147, 162).
Historically, town squares and downtown business districts were the public gathering centers for communities (see, e.g., Alderwood Assoc. v Washington Envtl. Council, 96 Wn 2d 230, 239, 635 P2d 108, 114; Note, Private Abridgment of Speech and the State Constitutions, 90 Yale LJ 165, 168). Not surprisingly, public parks, streets and sidewalks came to be recognized as traditional public forums where expressive activity such as leafletting received its greatest protection (see, e.g., Shuttlesworth v Birmingham, 394 US 147, 152; Jamison v Texas, 318 US 413, 415-416; Schneider v State, 308 US 147, 163, supra; Hague v C. I. O., 307 US 496, 515-516). When the significance of streets and sidewalks as public forums was *513 being developed in the 1930's and 1940's, privately owned shopping centers were virtually nonexistent; as late as 1950 there were fewer than 100 of them in the entire country (Eagle, Shopping Center Control: The Developer Besieged, 51 J Urb L 585, 589). By now, this number is greater than 25,000 (see, Shopping Center World, at 55 [Jan. 1985]), and, more importantly, privately owned shopping centers have, in many communities, replaced downtown business districts as the public gathering centers (see, e.g., Food Employees v Logan Plaza, 391 US 308, 318, 324; Robins v Prune Yard Shopping Center, 23 Cal 3d 899, 907, 910, 592 P2d 341, 345, 347, affd 447 US 74).
This displacement is most pronounced with respect to the large regional malls which contain numerous facilities other than retail shops and thereby encourage lengthy and frequent visits to the premises (see, Note, Private Abridgment of Speech and the State Constitutions, 90 Yale LJ, at 168). Again, the number of such malls has been dramatically increasing during the past 25 to 30 years (see, Sternleib and Hughes, Shopping Centers: U.S.A., at 180, 189), and New York has seen no exception to this trend (see, Shopping Center World, at 53 [Jan. 1985]; id., at 66, 78 [Jan. 1981]).
The facts found by the lower courts with respect to the Smith Haven Mall demonstrate the significant role that large regional shopping malls play as public gathering places. Almost one half of all its customers do not ordinarily shop at any other shopping centers, and its broad range of facilities insure that many of a person's shopping, business, entertainment and personal needs can be met there. The Mall promotes itself as a place for the public to congregate and linger, and the fact that it permits its facilities to be used for numerous public purposes, and does grant access to certain groups for the dissemination of information, belies any assertion that the premises are limited exclusively to commercial functions. The conclusion, reached by the lower courts, that the Mall has all of the attributes of a downtown business area or town center is inescapable.
It is also evident that, in light of the large number of people who congregate at the Mall, the exercise of free speech by those who seek to communicate with the general public will be adversely affected by a complete denial of access to the Mall. As the Supreme Court has sustained the constitutionality of a Federal statute prohibiting the placement of unstamped *514 materials in homeowners' mailboxes (see, United States Postal Serv. v Greenburgh Civic Assns., 453 US 114), a group without the funds needed for mass mailings or advertisements in the mass media will be effectively precluded from expressing its views to the public in those portions of New York, such as Suffolk County, where privately owned malls have become the primary public gathering places.[3]
The majority dwells on the requirement of State action under article I, § 8, and on the absence of the traditional indicia of State action set forth in the context of equal protection and due process claims. However, because the Mall, though privately owned, has, through its size, nature of use and broad invitation to the public, become the functional equivalent of a traditional public forum, and because a complete denial of access will have a significant adverse effect on the dissemination of ideas in the community, any requirement of State action under article I, § 8 has been satisfied, and the Mall should not be able to ban the distribution of leaflets on its premises. The mall owner, of course, would be entitled to adopt time, place and manner restrictions on the leafletting designed to prevent any interference with the commercial functions of the Mall (see, Prune Yard Shopping Center v Robins, 447 US, at p 83; id., at pp 96-97 [Powell, J., concurring]; Robins v Prune Yard Shopping Center, 23 Cal 3d, at p 910, 592 P2d, at p 347, supra; Batchelder v Allied Stores Intl., 388 Mass 83, 92, 445 NE2d 590, 595).
Our State Constitution is an innovative document. It was intended to ensure that rights and privileges granted in the past would be preserved in the future under changing conditions. In the past, those who had ideas they wished to communicate to the public had the unquestioned right to disseminate those ideas in the open marketplace. Now that the marketplace has a roof over it, and is called a mall, we should not abridge that right.
Order reversed, with costs, defendant's motion for summary judgment granted, plaintiffs' motion for summary judgment denied, and judgment granted in favor of defendant declaring that plaintiffs have no right to distribute leaflets on defendant's property, contrary to defendant's wishes.
NOTES
[1] "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press."
[2] In fact, during the 1976 New York Senatorial campaign, then United States Senator James Buckley was evicted from the Mall when he attempted to campaign there.
[3] The Supreme Court has acknowledged that, in certain circumstances, a State may recognize broader free speech rights as a matter of State law without offending any Federally guaranteed rights enjoyed by the property owner (Prune Yard Shopping Center v Robins, 447 US 74).
[4] General Root's view is consistent with the history of the free speech clauses contained in American State Constitutions as traced by Professor Chaffee. He notes that, unlike their European counterparts, the free speech provisions in American Constitutions are "not merely expressions of political faith * * * Their history shows that they limit legislative action as much as any other part of the Bill of Rights" (Chaffee, Free Speech in the United States, at 4). Professor Chaffee also observes that the first clause of article I, § 8, which the dissent urges is some sort of affirmative guarantee of free expression, actually was aimed at curbing legislation concerning defamation (id., at 5, n 2, citing Reports of New York Constitutional Convention of 1821, at 167, 487). Sister State courts have construed identical language in their Constitutions as a limitation on legislative power to abolish defamation actions (Note, Developments in the Law: The Interpretations of State Constitutional Rights, 95 Harv L Rev 1324, 1405-1406; see, McCall v Courier-Journal & Louisville Times Co., 623 SW2d 882, 886 [Ky], cert denied 456 US 975).
[5] State v Schmid (84 NJ 535, 423 A2d 615, appeal dismissed sub nom. Princeton Univ. v Schmid, 455 US 100), which did not involve a shopping center, does not rest on an abandonment of a State action requirement for the court noted that its prior decisions had "observed that the State Constitution serves only to limit the sovereign power which inheres directly in the people and indirectly in their elected representatives" (84 NJ, at p 558, 423 A2d, at p 627; see also, Brown v Davis, 203 NJ Super 41, 495 A2d 900). In any event, New Jersey added its free speech provision in 1844, well after New York had done so (84 NJ, at 557-558, 423 A2d, at p 627). Thus, its analysis sheds little light on the intent of the framers of the New York Bill of Rights.

In Alderwood Assoc. v Washington Envtl. Council (96 Wn 2d 230, 635 P2d 108), a majority of the court actually rejected the abrogation of a State action requirement. Justice Dolliver, whose vote was decisive, emphatically rejected the plurality's reasoning, finding it "both unnecessary and imprudent" (96 Wn 2d, at p 247, 635 P2d, at p 118).
The 4-3 decision of the California Supreme Court in Robins v Prune Yard Shopping Center (23 Cal 3d 899, 592 P2d 341, affd 447 US 74) is hardly persuasive authority. That court, in overruling its own contrary precedent only five years old (Diamond v Bland, 11 Cal 3d 331, 521 P2d 460, cert denied 419 US 885), simply said that the California Constitution protected speech and petitioning at private shopping centers. There is not much analysis and only tangential discussion, if it can be called that, of the State action question. It is evident that the result in Robins was dictated by "the accident of a change of personalities in the Judges of [the] court", which this court has correctly condemned as "a shallow basis for jurisprudential evolution" (People v Hobson, 39 N.Y.2d 479, 491). Be that as it may, the California Constitution was adopted in 1849 (see, Diamond v Bland, 11 Cal 3d, at pp 337-338, 521 P2d 460, 465 [dissenting opn]) and thus similarly offers no insight on the construction of the New York Constitution.
[6] In Sharrock v Dell Buick-Cadillac (45 N.Y.2d 152, 157-163), for example, we did not determine that, under the circumstances of the particular infringement, State action need not be shown. Rather, we formulated a method of determining whether governmental conduct could be inferred or discovered in a transaction that historically had been characterized as "private." It is also instructive to note that the framers of the proposed New York State Constitution of 1967  whose aim was to modernize the Constitution to meet changing needs and understandings  adopted a view and articulation of the free speech right that clearly included a State action requirement (see, 12 Proceedings of 1967 Constitutional Convention of the State of New York, at 3 [text of proposed free speech provision]; and see, id., vol 3, at 347-351 [debate concerning the propriety of adopting the free speech language of the First Amendment]).
[7] Structurally and functionally, a shopping center is very different from the "company town" in Marsh v Alabama (326 US 501, 502), which consisted of "residential buildings, streets, a system of sewers, a sewage disposal plant and a `business block.'" The Mall is closed to the public after business hours and the owner does not perform "the full spectrum of municipal powers" or "[stand] in the shoes of the State" (Lloyd Corp. v Tanner, 407 US 551, 569).
[8] It should also be noted that whether the Mall was designed and used not merely as a commercial center, but as a social and community center as well, and whether there are meaningful alternatives for free expression, were hotly contested questions of fact, which could not be resolved by summary judgment (CPLR 3212 [b]; Lopez v Senatore, 65 N.Y.2d 1017; Winegrad v New York Univ. Med. Center, 64 N.Y.2d 851). The findings of the courts below on these questions, relied on by the dissent, could not be accepted by this court in the present procedural posture. For the purpose of disposition of this appeal, however, these findings are irrelevant.
[1] The First Amendment provides that "Congress shall make no law * * * abridging the freedom of speech".
[2] In Sharrock v Dell Buick-Cadillac (45 N.Y.2d 152), we recognized the importance of such linguistic differences from a parallel provision of the United States Constitution in determining whether to interpret a State constitutional provision more broadly than its Federal counterpart. In Sharrock, we relied largely on "the unique language of the due process clause of the New York Constitution" and more specifically, on the absence of "any language requiring State action" (id., at pp 159, 160), in holding that the State provision did not contain the same State action requirement as that in the 14th Amendment to the United States Constitution. The majority's claim that the first clause of article I, § 8 "was aimed at curbing legislation concerning defamation" (majority opn, at p 500, n 4) is unsupported by either the text of the provision, the second sentence of which specifically provides that in a prosecution for libel "if it shall appear to the jury that the matter charged as libelous is true, and was published with good motives * * * the party shall be acquitted", or by Professor Chaffee's statement cited by the majority, which unambiguously refers to this second sentence.
[3] The harm to those groups which need personal contact with the public, such as to collect signatures for a petition, will, of course, be even more pronounced.